Christina R.B. López (State Bar No. 312610)
SHERRARD ROE VOIGT & HARBISON, PLC
150 Third Avenue South, Suite 1100
Nashville, TN 37201
Telephone:   615-742-4200
Facsimile:   615-742-4539
Email: clopez@srvhlaw.com

***Counsel for Plaintiffs Associated Grocers
of the South, Inc., Dollar General Corp.,
Dolgencorp, LLC, Meijer, Inc.,
Meijer Distribution, Inc., Publix Super
Markets, Inc., Raley's, United Natural
Foods, Inc., Supervalu, Inc., Associated
Grocers of Florida, Inc., Unified Grocers, Inc.,
Tony's Fine Foods and Wakefern Food Corp.***

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASSOCIATED GROCERS OF THE SOUTH, INC., DOLLAR GENERAL CORPORATION, DOLGENCORP, LLC, MEIJER, INC., MEIJER DISTRIBUTION, INC., PUBLIX SUPER MARKETS, INC., RALEY'S, UNITED NATURAL FOODS, INC., SUPERVALU, INC., ASSOCIATED GROCERS OF FLORIDA, INC., UNIFIED GROCERS, INC., TONY'S FINE FOODS, WAKEFERN FOOD CORP. | Case No. |
| Plaintiffs, | |
| vs. | |
| AGRI STATS, INC., CLEMENS FOOD GROUP, LLC, THE CLEMENS FAMILY CORPORATION, HORMEL FOODS CORPORATION, JBS USA FOOD COMPANY, SEABOARD FOODS LLC, SMITHFIELD FOODS, INC., TRIUMPH FOODS, LLC, TYSON FOODS, INC., TYSON PREPARED FOODS, INC., AND TYSON FRESH MEATS, INC. | |
| Defendants. | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

I.      NATURE OF ACTION ...................................................................................1

II.     JURISDICTION AND VENUE .....................................................................3

III.    PARTIES .........................................................................................................4

        A.      Plaintiffs .............................................................................................4

        B.      Defendants ..........................................................................................6

                (1)     Agri Stats ................................................................................6

                (2)     Clemens...................................................................................6

                (3)     Hormel .....................................................................................7

                (4)     JBS ...........................................................................................7

                (5)     Seaboard ..................................................................................8

                (6)     Smithfield.................................................................................8

                (7)     Triumph....................................................................................8

                (8)     Tyson........................................................................................8

IV.     CO-CONSPIRATORS AND AGENTS ........................................................9

V.      TRADE AND COMMERCE.......................................................................10

VI.     THE IMPORTANCE OF AGRI STATS TO THE UNLAWFUL CONSPIRACY
        ALLEGED IN THIS COMPLAINT............................................................10

        A.      Agri Stats Markets its Collusive Scheme to Pork Producers ...........10

        B.      Agri Stats Provided Producer Defendants and Co-Conspirators With the
                Ability to Monitor and Enforce Their Collective Restriction of the Pork
                Supply, and to Discipline Co-Conspirators For Not Complying With the
                Conspiracy ........................................................................................12

VII.    THE MARKET FOR THE PRODUCTION AND SALE OF PORK WAS
        CONDUCIVE TO CARTELIZATION ........................................................19

        A.      Pork is a Commodity Product With Inelastic Demand......................19

        B.      The Producer Defendants and Co-Conspirators Controlled the Production and
                Supply of Pork in the United States, Which Allowed the Conspiracy to
                Succeed ..............................................................................................20

        C.      The Market For the Production and Sale of Pork Was Concentrated.............25

        D.      There Were Barriers to Entry in the Market For the Integrated Production and
                Sale of Pork.......................................................................................30

E.      Select Trade Associations Facilitated Collusion................................................30

VIII. DEFENDANTS AND CO-CONSPIRATORS IMPLEMENTED COLLUSIVE, ANTICOMPATITIVE CAPACITY AND PRODUCTION RESTRICTIONS ..........32

A.      Overview of the Restriction of the Pork Supply During the Conspiracy ........32

(1)      Smithfield................................................................................35

(2)      Tyson........................................................................................36

(3)      JBS/Cargill................................................................................37

(4)      Hormel .....................................................................................37

(5)      Seaboard...................................................................................37

(6)      Triumph....................................................................................38

(7)      Clemens....................................................................................38

B.      Timeline of the Conspiracy........................................................................38

IX.     ABNORMAL PRICING DURING THE CONSPIRACY DEMONSTRATES THE SUCCESS OF THE CONSPIRACY ..............................................................49

X.      THE CONSPIRACY WAS EFFECTIVE IN INCREASING THE PRICE OF PORK SOLD TO PLAINTIFFS AND OTHERS IN THE UNITED STATES....................51

XI.     THE RESULTS OF THE DOJ'S CRIMINAL INVESTIGATION IN BROILER CHICKENS SUPPORTS AN INFERENCE OF THE EXISTENCE OF A SIMILAR CONSPIRACY IN THE PORK INDUSTRY .............................................................53

XII.    PLAINTIFFS' CLAIMS ARE TIMELY......................................................................54

COUNT I ANTITRUST VIOLATION ..............................................................................58

COUNT II  VIOLATION OF THE PACKERS AND STOCKYARD ACT (AGAINST ALL DEFENDANTS EXCEPT AGRI STATS) .........................................................61

1      Plaintiffs Associated Grocers of the South, Inc., Dollar General Corporation, Dolgencorp,

2  LLC, Meijer, Inc., Meijer Distribution, Inc., Publix Super Markets, Inc., Raley's, United Natural

3  Foods, Inc., Supervalu, Inc., Associated Grocers of Florida, Inc., Unified Grocers, Inc., Tony's

4  Fine Foods, and Wakefern Food Corp. (collectively, "Plaintiffs") sue Defendants Agri Stats, Inc.,

5  Clemens Food Group, LLC, The Clemens Family Corporation, Hormel Foods Corporation, JBS

6  USA Food Company, Seaboard Foods LLC, Smithfield Foods, Inc., Triumph Foods, LLC, Tyson

7  Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. (collectively, "Defendants")

8  and allege as follows:

9  **I.      NATURE OF ACTION**

10      1.      As more fully alleged below, between at least approximately 2009 and 2018, if not

11  later, and with a lingering effect, Defendants and their co-conspirators conspired to fix, increase,

12  maintain and/or stabilize the price of pork[1] sold to Plaintiffs and others in the United States, and

13  implemented this conspiracy through anticompetitive conduct, including, without limitation,

14  coordinating among themselves to restrict the output and limit the production[2] of their swine herd

15  in order to reduce the domestic supply of pork.

16      2.      Defendants and their co-conspirators' anticompetitive coordination to restrict the

17  pork supply occurred in several ways.

18      3.      For example, during the conspiracy, the Producer Defendants[3] and co-conspirators[4]

19  – who controlled more than 80% of the pork market at times relevant to Plaintiffs' claims – used

---

[1]      For purposes of this Complaint, "pork" includes all pork products, regardless of the
form in which they are sold, and all products containing pig meat, whether purchases fresh or
frozen, including but not limited to, smoked ham, sausage, and bacon.  From time to time in this
Complaint, "pork" and "swine" are used interchangeably, particularly when referring to the pork
or swine industry.

[2]      Restricting output or production, and limiting production, can mean reducing output
in absolute or relative terms, or maintaining or not increasing output, *i.e.*, limiting output, as much
as a firm would do so in a competitive market.

[3]      As used in this Complaint, with respect to claims brought by all Plaintiffs but Dollar
General and Raley's, the phrase "Producer Defendants" means Clemens, Hormel, Seaboard,
Smithfield, Triumph, and Tyson as each is defined below. With respect to claims brought by
Raley's and Dollar General, the phrase "Producer Defendants" means Clemens, Hormel, Seaboard,
Smithfield, Triumph, Tyson, and JBS (as defined below).  Agri Stats is a Defendant, but not a
Producer Defendant.

[4]      As used in this Complaint, the phrase "co-conspirator" includes other pork producers

their co-conspirator Agri Stats to exchange with each other detailed, competitively-sensitive, and closely guarded non-public information about their pork businesses, including benchmarking reports, about their respective pork prices, production, volume, costs, slaughter information, capacity, sales volume, inventory levels, and plant-specific information about production lines and yields (collectively "Competitively-Sensitive Information").  As explained below, Agri Stats collected this information from the Producer Defendants and co-conspirators and intentionally shared this information with them in detailed reports.  The Producer Defendants and co-conspirators knew when they provided their respective Competitively-Sensitive Information to Agri Stats that it would be reported to their competitors in the private Agri Stats reports.  They also knew at the time that their Competitively-Sensitive Information in the Agri Stats reports were deciphered by their co-Defendants and co-conspirators so that each of them would learn which Competitively-Sensitive Information belonged to which Producer Defendant or co-conspirator. This enabled the Producer Defendants and co-conspirators to monitor each other's Competitively-Sensitive Information and enforce the conspiracy, and effectively control domestic pork supply and price.

4.     Another example of how, during the conspiracy, Defendants and co-conspirators coordinated in an anticompetitive manner to restrict the pork supply was through public statements, aimed at each other, regarding the need to restrict pork production.  These statements served a signaling purpose and emphasized to one another that an understanding or agreement – or solidarity – existed among them.  By its own account, Smithfield took a leadership role in this regard. Defendants and co-conspirators then furthered their conspiracy by each taking action to cut pork supply or limit pork supply increases more than each otherwise would have done in a competitive market.  These actions would have been against each Producer Defendant and co-conspirator's business interest but for the existence of the conspiracy, which allowed for their collective action.

5.     Plaintiffs allege that Defendants and their co-conspirators' conspiracy is a *per se* violation of Section One of the Sherman Act,15 U.S.C. § 1 (Count I), and the Producer Defendants

_____

including without limitation, JBS (except with respect to claims by Dollar General and Raley's) as described below.  The phrase "co-conspirator" also includes other firms and individuals.

and co-conspirators' conduct as alleged in this Complaint violates the Packers and Stockyards Act as well (Count II).

## II.    JURISDICTION AND VENUE

6.    Each Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Section 308 of the Packers and Stockyards Act ("PSA"), 7 U.S.C. § 209, for the injuries sustained by each Plaintiff as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 202 of the PSA, 7 U.S.C. § 192.

7.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and Section 308 of the PSA, 7 U.S.C. § 209.

8.    Venue is proper in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 & 26, 28 U.S.C. § 1391(b), (c) and (d), and Section 308 of the PSA, 7 U.S.C. § 209,  because: (a) one or more Defendants resides or resided, is found, transacts or transacted business in this District, or is licensed to do business or is doing business in this District; (b) a substantial portion of the affected interstate commerce described in this Complaint was carried out in this District; (c) each Defendant is subject to personal jurisdiction in this District; and/or (d) to the extent that there is no District in which this action may otherwise be brought, then venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because one or more Defendants is/are found in this District.

9.    This Court has personal jurisdiction over each Defendant because, among other reasons, each Defendant: (a) inhabits, transacts business in, has continuing or systematic contacts with, or is found in this District; (b) has sufficient minimum contacts in the United States sufficient to satisfy due process; (c) manufactured, sold, shipped, and/or delivered substantial quantities of pork throughout the United States, including in this District; (d) belonged to the conspiracy alleged in this Complaint, and one or more of them, and their co-conspirators, performed unlawful acts in furtherance of the conspiracy in this District, including, without limitation, selling pork to one or more Plaintiffs and others in this District at artificially inflated prices; and/or (e) engaged in unlawful conduct that was directed at and had a direct, foreseeable, and intended effect of causing

injury to the business or property of persons residing or located in, or doing business throughout, the United States, including in this District.

### III.   PARTIES

####    A.   Plaintiffs

10.   Plaintiff Associated Grocers of the South, Inc. ("AGS") is an Alabama corporation with its principal place of business located in Birmingham, Alabama. AGS brings this action on its own behalf as a direct purchaser of pork from one or more Defendants and their co-conspirators during the conspiracy. AGS is a grocery cooperative that sells pork to its members. During the time period relevant to Plaintiffs' claims, AGS directly purchased pork in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.

11.   Plaintiffs Dollar General Corporation ("DGC"), a Tennessee Corporation, and Dolgencorp, LLC (together with DGC, "Dollar General"), a Kentucky Limited Liability Company, have a principal place of business in Goodlettsville, Tennessee.  Dollar General brings this action on its own behalf as a direct purchaser of pork from one or more Defendants and their co-conspirators during the conspiracy. Dollar General also brings this action as an assignee of certain claims of Nash Finch Company.  Dollar General owns and operates retail stores that sell pork. During the time period relevant to Plaintiffs' claims, Dollar General directly purchased pork in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.

12.   Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. (individually and collectively, "Meijer") are Michigan corporations, with their principal place of business located in Grand Rapids, Michigan. Meijer brings this action on its own behalf as a direct purchaser of pork from one or more Defendants and their co-conspirators during the conspiracy. Meijer owns and operates retail stores that sell pork. During the time period relevant to Plaintiffs' claims, Meijer directly purchased pork in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.

13.    Plaintiff Publix Super Markets, Inc. ("Publix") is a Florida corporation with its principal place of business located in Lakeland, Florida. Publix brings this action on its own behalf as a direct purchaser of pork from one or more Defendants and their co-conspirators during the conspiracy. Publix owns and operates retail stores that sell pork. During the time period relevant to Plaintiffs' claims, Publix directly purchased pork in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.

14.    Plaintiff Raley's ("Raley's) is a California corporation with its principal place of business in West Sacramento, California. Raley's brings this action on its own behalf as a direct purchaser of pork from one or more Defendants and their co-conspirators during the conspiracy. Raley's owns and operates retail stores that sell pork. During the time period relevant to Plaintiffs' claims, Raley's directly purchased pork in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.

15.    Plaintiff United Natural Foods, Inc. is a Delaware corporation with its principal place of business in Providence, Rhode Island.  Plaintiff SUPERVALU, INC. is a wholly owned subsidiary of United Natural Foods, Inc. Plaintiff Associated Grocers of Florida, Inc. is a wholly owned subsidiary of SUPERVALU, Inc.  Plaintiff Unified Grocers, Inc. is a wholly owned subsidiary of SUPERVALU, INC.  Plaintiff Tony's Fine Foods is a wholly owned subsidiary of United Natural Foods, Inc. Collectively, United Natural Foods, Inc., SUPERVALU, INC. Associated Grocers of Florida, Inc., Tony's Fine Foods, and Unified Grocers, Inc. are referred to as "UNFI."  UNFI brings this action on its own behalf as a direct purchaser of pork from one or more Defendants and their co-conspirators during the conspiracy.  UNFI is a leading distributor of natural, organic, specialty, produce, and conventional grocery and non-food products in the United States.  During the time period relevant to Plaintiffs' claims, UNFI directly purchased pork in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.

16.     Plaintiff Wakefern Food Corporation ("Wakefern") is a New Jersey corporation with its principal place of business located in Elizabeth, New Jersey. Wakefern brings this action on its own behalf as a direct purchaser of pork from one or more Defendants and their co-conspirators during the conspiracy. Wakefern owns and operates retail stores that sell pork. During the time period relevant to Plaintiffs' claims, Wakefern directly purchased pork in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.

17.     Each Plaintiff is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) & 26, and Section 209(b) of the Packers and Stockyards Act, 7 U.S.C. § 209(b).

### B.     **Defendants**

#### (1)     Agri Stats

18.     Agri Stats, Inc. ("Agri Stats") is an Indiana corporation located in Fort Wayne, Indiana.  Until about 2018, Agri Stats was a subsidiary of Eli Lilly & Co.  Agri Stats is now a wholly-owned subsidiary of Agri Stats Omega Holding Co. LP, a limited partnership based in Indiana.  During the time period relevant to Plaintiffs' claims in this Complaint, Agri Stats directly: participated in the conspiracy alleged in this Complaint; facilitated the exchange of the Producer Defendants and their co-conspirators' Competitively-Sensitive Information among Defendants and their co-conspirators; and engaged in the unlawful conduct alleged in this Complaint, which proximately caused injury and damage to Plaintiffs.

#### (2)     Clemens

19.     Clemens Food Group, LLC is a limited liability company with its principal place of business in Hatfield, Pennsylvania.  During the time period relevant to Plaintiffs' claims in this Complaint, Clemens Food Group, LLC: participated in the conspiracy alleged in this Complaint; and directly or through an affiliate co-conspirator sold pork in interstate commerce to Plaintiffs and others in the United States.

20.    The Clemens Family Corporation is a Pennsylvania corporation with its principal place of business in Hatfield, Pennsylvania.   The Clemens Family Corporation is the parent company of Clemens Food Group, LLC.  During the time period relevant to Plaintiffs' claims in this Complaint, The Clemens Family Corporation: participated in the conspiracy alleged in this Complaint; and directly or through an affiliate co-conspirator sold pork in interstate commerce to Plaintiffs and others in the United States.

21.    Clemens Food Group, LLC and The Clemens Family Corporation are referred to in this Complaint as "Clemens."   During the time period relevant to Plaintiffs' claims in this Complaint, Clemens engaged in the unlawful conduct alleged in this Complaint, which proximately caused injury and damage to Plaintiffs.

(3)    Hormel

22.    Hormel Foods Corporation ("Hormel") is a Delaware corporation with its principal place of business in Austin, Minnesota.  During the time period relevant to Plaintiffs' claims in this Complaint, Hormel: participate in the conspiracy alleged in this Complaint; directly or through an affiliate co-conspirator sold pork in interstate commerce to Plaintiffs and others in the United States; and engaged in the unlawful conduct alleged in this Complaint, which proximately caused injury and damage to Plaintiffs.

(4)    JBS

23.    JBS USA Food Company ("JBS") is one of the world's largest beef and pork processing companies and a wholly owned subsidiary of JBS USA Food Company Holdings, Inc., which holds a 78.5 percent controlling interest in Pilgrim's Pride Corporation, one of the largest chicken-producing companies in the world. JBS is a Delaware corporation, headquartered in Greeley, Colorado. During the Relevant Period, JBS and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.  Only Dollar General and Raley's bring claims against JBS and it is a defendant only as to those two plaintiffs.

1

2

(5)   <u>Seaboard</u>

24.   Seaboard Foods LLC ("Seaboard") is a limited liability company with its principal place of business in Shawnee Mission, Kansas.  Seaboard is a wholly owned subsidiary of Seaboard Corporation.  During the time period relevant to Plaintiffs' claims in this Complaint, Seaboard: participated in the conspiracy alleged in this Complaint; directly or through an affiliate co-conspirator sold pork in interstate commerce to Plaintiffs and others in the United States; and engaged in the unlawful conduct alleged in this Complaint, which proximately caused injury and damage to Plaintiffs.

(6)   <u>Smithfield</u>

25.   Smithfield Foods, Inc. ("Smithfield") is a Commonwealth of Virginia corporation with its principal place of business in Smithfield, Virginia.  Smithfield is a subsidiary of WH Group Limited, a Chinese company.  During the time period relevant to Plaintiffs' claims in this Complaint, Smithfield: participated in the conspiracy alleged in this Complaint; directly or through an affiliate co-conspirator sold pork in interstate commerce to Plaintiffs and others in the United States; and engaged in the unlawful conduct alleged in this Complaint, which proximately caused injury and damage to Plaintiffs.

(7)   <u>Triumph</u>

26.   Triumph Foods, LLC ("Triumph") is a limited liability company with its principal place of business in St. Joseph, Missouri.  During the time period relevant to Plaintiffs' claims in this Complaint, Triumph: participated in the conspiracy alleged in this Complaint; directly or through an affiliate co-conspirator sold pork in interstate commerce to Plaintiffs and others in the United States; and engaged in the unlawful conduct alleged in this Complaint, which proximately caused injury and damage to Plaintiffs.

(8)   <u>Tyson</u>

27.   Tyson Foods, Inc. is a Delaware corporation with its principal place of business in Springdale, Arkansas.  During the time period relevant to Plaintiffs' claims in this Complaint, Tyson Foods, Inc.: participated in the conspiracy alleged in this Complaint; and directly or through

an affiliate co-conspirator sold pork in interstate commerce to Plaintiffs and others in the United States.

28.    Tyson Prepared Foods, Inc. is a Delaware corporation with its principal place of business in Springdale, Arkansas.  Tyson Prepared Foods, Inc. is a wholly owned subsidiary of Tyson Foods, Inc.  During the time period relevant to Plaintiffs' claims in this Complaint, Tyson Prepared Foods, Inc.: participated in the conspiracy alleged in this Complaint; and directly or through an affiliate co-conspirator sold pork in interstate commerce to Plaintiffs and others in the United States.

29.    Tyson Fresh Meats, Inc. is a Delaware corporation with its principal place of business in Springdale, Arkansas.  Tyson Fresh Meats, Inc. is a wholly owned subsidiary of Tyson Foods, Inc.  During the time period relevant to Plaintiffs' claims in this Complaint, Tyson Fresh Meats, Inc.: participated in the conspiracy alleged in this Complaint; and directly or through an affiliate co-conspirator sold pork in interstate commerce to Plaintiffs and others in the United States.

30.    Tyson Foods, Inc., Tyson Prepared Foods, Inc. and Tyson Fresh Meats, Inc. are referred to in this Complaint as "Tyson."  During the time period relevant to Plaintiffs' claims in this Complaint, Tyson engaged in the unlawful conduct alleged in this Complaint, which proximately caused injury and damage to Plaintiffs.

## IV.    CO-CONSPIRATORS AND AGENTS

31.    Other entities and individuals not named as Defendants in this Complaint, including, without limitation, JBS USA Food Company, combined, conspired, or agreed with Defendants and committed acts in furtherance of the unlawful conspiracy alleged in this Complaint. For clarity, JBS is named as a Defendant only by Plaintiffs Dollar General and Raley's, and JBS is identified as a co-conspirator by all of the other Plaintiffs.

32.    The individuals employed by Defendant and co-conspirators who participated in the conspiracy did so on behalf of their respective employer Defendant or co-conspirator, and their conduct in furtherance of the conspiracy was undertaken by each of them during the course and scope of their employment by their Defendant or co-conspirator employer.

1    **V.      TRADE AND COMMERCE**

2           33.     During the time relevant to Plaintiffs' claims, Defendants and their co-conspirators

3    engaged in business that affects or is within the flow of interstate commerce, and the effect of that

4    business on interstate commerce is substantial.  In particular, the activities of Defendants and co-

5    conspirators are within the flow of interstate and foreign commerce or have a substantial effect

6    upon interstate or foreign commerce in that: (a) Defendants and their co-conspirators sold and

7    shipped substantial quantities of pork in a continuous and uninterrupted flow in interstate

8    commerce to customers located in States other than the States in which the Defendants and their

9    co-conspirators produced the pork; (b) data, information, correspondence and/or financial material

10   were exchanged between each Defendant in the State in which each is located, incorporated, or has

11   its principal place of business and other States; and/or (c) money flowed between banks outside of

12   the State in which each Defendant is located, incorporated, or has its principal place of business

13   and other States.

14          34.     The effect of Defendants and/or their co-conspirators' anticompetitive conduct on

15   United States commerce gives rise to Plaintiffs' claims.

16   **VI.     THE IMPORTANCE OF AGRI STATS TO THE UNLAWFUL CONSPIRACY
             ALLEGED IN THIS COMPLAINT**
17

18          35.     Agri Stats had a central role in the conspiracy alleged in this Complaint.  As

19   explained below, it collected and disseminated the Producer Defendants and co-conspirators'

20   Competitively Sensitive Information, and Agri Stats provided detailed price reports to the Producer

21   Defendants and co-conspirators through its subsidiary, Express Markets, Inc.  Agri Stats' role in

22   the conspiracy is further described below.

23          **A.      Agri Stats Markets its Collusive Scheme to Pork Producers**

24          36.     Beginning in 2008 or before, Agri Stats proposed a series of benchmarks to the pork

25   industry to monitor pork production.  Benchmarking is the act of comparing one company's

26   practices, methods or performance against those of other companies.  Benchmarking of the type

27   undertaken by Agri Stats and the Producer Defendants and co-conspirators reduces strategic

28   uncertainty in the market and changes the incentives for competitors to compete, thereby enabling

companies to coordinate their market strategies and otherwise restrict competition. This is especially true when, as alleged in this Complaint, benchmarking involves the exchange of commercially sensitive, and typically non-public, information among competitors about a commodity product.

37.    In 2008, Greg Bilbrey ("Bilbrey") of Agri Stats told swine industry participants: "Benchmarking in the swine industry could range from simple production comparisons to elaborate and sophisticated total production and financial comparisons. Each and every commercial swine operation is encouraged to participate in some benchmarking effort."[5]

38.    Agri Stats emphasized to the Producer Defendants and co-conspirators that the goal of collectively sharing their Competitively-Sensitive Information was to increase their profits in the sale of pork and not to increase their pork production. As Agri Stats explained at the time: "We must remember that the ultimate goal is increasing profitability – not always increasing the level of production." Furthermore, Agri Stats told the industry: "Each swine production company should be participating in some type of benchmarking. To gain maximum benefit, production, cost and financial performance should all be part of the benchmarking program."[6]

39.    In April 2009, Agri Stats' Bilbrey again invited pork producers, including Producer Defendants and co-conspirators, to design and operate their own benchmarking effort: "Though all producers may not be part of or fit into an Agri Stats type benchmarking program, all producers could participate in benchmarking in some way. Commercial benchmarking opportunities are available. Producer groups could design and operate their own benchmarking effort."[7]

40.    The Producer Defendants and co-conspirators accepted this invitation and, not later than 2009, they started participating in the detailed benchmarking scheme using Agri Stats and its reports. The Producer Defendants and co-conspirators' recognized, understood and agreed that the Competitively-Sensitive Information that they received about each other's pork business in the Agri Stats'

---

[5]    Greg Bilbrey, *Benchmarking and Cost – Production Relationships*, 19 Advances in Pork Production Journal, at 43 (2008).

[6]    *Id*. at 46.

[7]    Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, London Swine Conference – Tools of the Trade (April 1-2, 2009).

reports provided them with a means to collectively restrict pork production and monitor and enforce their respective compliance with such collective action for the purpose and with the effect of increasing, fixing, maintaining and/or stabilizing the price of pork sold to Plaintiffs and others.

41.     Each Producer Defendant identified specific executives who were responsible for transmitting data to and from Agri Stats relating to pork pricing, supply, slaughter, inventory, export or production levels.

- Clemens: Joshua Rennels (Treasurer, Clemens Food Group)

- Hormel: Paul Bogle (Director, Cost Accounting)

- JBS: Gary Albright (Head of Business Analysis), Kevin Arnold (Head of Finance), Jamie Fosbery (Analyst), Raven Goodlow (Business Analyst), Robbie Kearns (Business Analyst), Lisa Peters (Business Analyst), Eli Zoske (Cost Accountant)

- Seaboard: Damon Ginther (Senior Director of Business Data & Analytics), Mel Davis (Vice President of Hog Procurement and Bio-Energy), Tom Dye (Operations Controller)

- Smithfield: Aimee Ward (Director, Hog Finance), Kent Hillbrands (Sr. Director, Operations Finance), Elizabeth Barger (Data Analyst)

- Triumph: Matt England (Chief Integrated Business Strategy Officer), Ken Grannas (Director Inventory/Reporting), Tom French (Director, Margin Management), Joe Diebold (Chief Financial Officer), Dan Marlow (Corporate Controller)

- Tyson: Deb McConnell (Division Controller

**B.    Agri Stats Provided Producer Defendants and Co-Conspirators With the Ability to Monitor and Enforce Their Collective Restriction of the Pork Supply, and to Discipline Co-Conspirators For Not Complying With the Conspiracy**

42.     Agri Stats provided the Producer Defendants and co-conspirators with the ability to share critical and proprietary information concerning key pork business metrics, including production levels and short and long-term production capacity.  Agri Stats was key to the formation, operation, and continuing stability of the conspiracy alleged in this Complaint.  For their conspiracy to be effective, the Producer Defendants and co-conspirators had to have confidence that each of them was restricting pork production.  Agri Stats provided that assurance.

43.     Clemens, Hormel, JBS, Seaboard, Smithfield, Triumph and Tyson were Agri Stats subscribers and reported their Competitively-Sensitive Information to Agri Stats.  In 2016, Agri

Stats' then-parent company, Eli Lilly, reportedly stated that "over 90% of the poultry and pig market"[8] uses Agri Stats in the United States.  Therefore, if enough of the Producer Defendants and co-conspirators subscribed to Agri Stats during the conspiracy – which they did – and if enough of them restricted pork production during that period – which they did – then the conspiracy would be effective in increasing, maintaining, stabilizing and/or fixing the price of pork sold to Plaintiffs and others above a competitive level – which it was.

44.    Bilbrey of Agri Stats told the London Swine Conference[9] in March of 2012: "Agri Stats collects participant financial and production data electronically each month.  Internal auditors convert the data, prepare it for comparison, and perform the monthly audits.  Each company's financial data is reconciled to their general ledger to help ensure actual costs are reported.  Raw numbers are used in Agri Stats' standardized calculations, so all company numbers are calculated the same way."[10]

45.    Unlike traditional "benchmark" services that rely upon unaudited and aggregated publicly available data, Agri Stats reportedly obtained audited data directly from Producer Defendants and co-conspirators during the conspiracy.  When a producer joined Agri Stats, the latter's employees spent up to a month at the producer's site to learn, set up, audit, and prepare the producer to submit its data each month.  After submission, Agri Stats took raw data and pulled it into input systems in the right format and location each month.  This verified data allowed participants to make an "apples to apples" comparisons with competitors in order to increase profitability.

46.    During the conspiracy, Producer Defendants and co-conspirators who subscribed to Agri Stats received monthly detailed reports and graphs that allowed them to compare their

---

[8]    Transcript, Eli Lilly and Co. at Morgan Stanley Global Healthcare Conference (Sept. 13, 2016).

[9]    The London Swine Conference began in 2001, and "[i]ts main aim is to provide a forum for the exchange of credible, science-based information for decision makers and influencers in the pork industry, to encourage the exchange and adoption of knowledge for the betterment of the industry."  https://www.londonswineconference.ca (last accessed Dec. 13, 2021).

[10]    Greg Bilbrey, *Implementing Simple and Useful Production Benchmarking*, London Swine Conference – A Time for Change (March 28-29, 2012).

performance and costs to other participants, the average of all companies, the top 25 percent, and the top five companies.  Current month, previous quarter and previous twelve-month periods were reported.  As of 2009, each monthly report contained nine sections for analysis and comparison: Performance Summary, Feed Mill, Ingredient Purchasing, Weaned Pig Production, Nursery, Finishing, Wean-to-Finish, Market Haul, Profit and Sales.[11]  Agri Stats' Bilbrey advised that their reports provided subscribers, including the Producer Defendants and co-conspirators, with "monthly detailed reports and performance summaries that allow them to compare their performance to other participants, the average of all companies and the top 25%."[12]

47.    Because of the nature of the life of a hog, even current and historical information regarding the production numbers of hogs provides forward-looking supply information to competitors.  The typical hog production cycle lasts about four years.  This is a function of the hog biological cycle.  Given the length of time needed to breed an existing sow, choose and retain offspring for breeding, and breed and rear the resulting crop of piglets, it takes a producer nearly two years to increase production substantially.

48.    On information and belief, one presentation from Agri Stats shows the level of detail provided to Defendants regarding profits in the pork market.[13]

Top 25% in Profit - Variances to Average Company - 2009-2007

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.89 | 107.27 | 98.93 |
| variance ranking | 12 | 1 | 5 | 11 | 7 | 2 | 8 | 4 | 9 | 6 | 3 | |

35,001,809 Pigs Finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.60 | 32.52 | 11.83 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 83.42 |

[11]    Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, London Swine Conference – Tools of the Trade (April 1-2, 2009).

[12]    Greg Bilbrey, *Benchmarking and Cost – Production Relationships*, 19 Advances in Pork Production Journal, p. 41 (2008).

[13]    Greg Bilbrey, *Key Drivers to Farm Profitability* (2011).

| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

30,785,319 Pigs finished

2007

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.80 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.23 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | 8 | | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | | 5 | | 3 | |

22,306,500 Pigs finished

49.     Agri Stats knew that it played a central role in this conspiracy.  Agri Stats repeatedly touted its role in standardizing the costs across companies – allowing the companies to compare the "apples to apples" of its data analysis among competitors.

50.     The purpose of the Agri Stats reports was not to increase competition or save customers money through lower prices and more efficient productions.  Instead, their purpose was to provide a means or mechanism for participating companies to monitor their collective effort to manipulate a commodity market tracked by Agri Stats, such as pork, in order to improve their profitability while artificially elevating prices of the product sold to Plaintiffs and others.

51.     A Special Report from the Banff Pork Seminar 2011 featured another presentation by Bilbrey of Agri Stats and Tom Stein of MetaFarms who "showed producers at the 2011 Banff Pork Seminar that better records mean better financial performance."[14]  The report explained that the Agri Stats benchmarking process requires producers to supply all of their production records and all financial records so that benchmarking results can be tied back to general ledger cost data. Bilbrey further explained the importance of the Agri Stats reports in increasing profitability: "This past 12 months top producers had about a $20 difference in profit, $11 a head lower cost and about $9 a head advantage in sales, the price they got for their pigs."[15]

52.     Much of the information shared by Agri Stats and the Producer Defendants and co-conspirators was unnecessary to achieve any legitimate benefits for pork purchasers.  Exchanging

---

[14]     *Tough Years in Pork Business Show Benefits of Benchmarking, Recordkeeping,* Inside BPS (Jan. 25, 2011), *available at* http:www.meristem.com/meetings/bps_2011-inside_bps.htm#15.

[15]     *Id.*

Competitively-Sensitive Information is not required to achieve major efficiencies.[16]  In fact, in a truly competitive market, the participants would closely protect their Competitively-Sensitive Information from disclosure, because providing it to competitors would be to their disadvantage - unless, of course, there was an agreement or understanding among them that they would use the information to the joint benefit of each other as occurred in the pork industry.

53.    In the lead up to and then during the conspiracy, Agri Stats knew that it played a central role in the formation, implementation and enforcement of the conspiracy alleged in this Complaint.  Agri Stats repeatedly touted its role in standardizing costs across its subscribers – allowing each of the Producer Defendants and co-conspirators to make an "apples to apples" comparison of its data against its competitors.  One presentation from Agri Stats spoke directly to this point, noting to industry participants that they could not undertake such a detailed cost analysis among competitors without Agri Stats auditing and standardizing the data:[17]

## Data Integrity

- Benchmarking is very important but it is hard to make sure data is comparable across companies.
- Even if all companies include the same costs the costs can be calculated differently.
- Lots of variation in cost accounting in industry.
- Companies can select key metrics, common calculations and implement an effective benchmarking program.



54.    Agri Stats stated that to ensure data contained in the reports were accurate, the participants had to "agree on calculation and data collection procedures," they must "[d]etermine

---

[16]    *FTC Roundtable on Information Exchanges Between Competitors Under Competition Law* Organization for Economic Cooperation and Development, (Oct. 21, 2010) at 6, https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/1010informationexchanges.pdf.

[17]    Greg Bilbrey, *Data Integrity*, Slideshare.net (Sept. 21, 2015), https://www.slideshare.net/trufflemedia/greg-bilbrey-data-integrity-using-records-for-benchmarking-and-operations.

tolerance and outlier status and enforce," they must "[h]ave an administrator to compile the data and enforce procedures," and most importantly, "[e]ach participant has to commit."[18]

55.    In addition to these reports, "Agri Stats account managers conduct[ed] on-site live reviews to assist with report utilization and analysis."[19]  The information provided by Agri Stats was so detailed that clients, including Producer Defendants and co-conspirators, requested the site visits by Agri Stats employees to assist them in understanding the intricacies and implications of the data.  Agri Stats' employees each possessed expertise in a specific area of production, and the value added by their insights was as important to the Producer Defendants and co-conspirators as the data in the reports themselves.  The fee for the visits fluctuated based on the size and other factors, but was substantial.

56.    During the time relevant to Plaintiffs' claims, Agri Stats' executives and account managers fanned out across the pork-producing regions of the United States to meet with their clients, including the Producer Defendants and co-conspirators.  Because Agri Stats traveled and was present among them regularly, discussing their respective Competitively-Sensitive Information, Agri Stats was in a unique position to share information among Defendants and co-conspirators at these regular meetings.

57.    A common saying by Agri Stats was "you cannot produce your way to the top of the page."  Rather, Agri Stats has stated that "the ultimate goal is increasing profitability – not simply increasing level of production."[20]

58.    By providing Competitively-Sensitive Information to Producer Defendants and co-conspirators, Agri Stats allowed each member of the conspiracy to monitor each other's ongoing adherence to agreed-upon plans for coordinated pork production limits.  Critically, Agri Stats provided forward-looking data that allowed the Producer Defendants and co-conspirators to determine each other's future production in addition to their current production.

---

[18]    *Id.*

[19]    Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, *from The Pig Site* https://www.thepigsite.com/articles/benchmarking-and-tools-to-maximise-profit.

[20]    Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, London Swine Conference – Tools of the Trade (April 1-2, 2009).

59.     During the conspiracy, Agri Stats' reports were organized by company and facility, but their names were not listed in the reports.  Nevertheless, while ostensibly anonymous, the reports contained such detailed figures covering many aspects of pork production and sales that participants could accurately identify the companies behind the metrics.  For example, long-time industry insiders were sufficiently familiar with each other to identify unique but recurring data points for other companies, as well as identify the other companies by general metrics and size.  The Producer Defendants and co-conspirators decoded the Agri Stats' reports so they knew their rivals' Competitively-Sensitive Information.

60.     Moreover, Agri Stats knew during the conspiracy that the anonymity of its system was compromised by individuals who had gleaned knowledge of competitors' identification numbers.

61.     Suppliers received as many as one dozen books of data at the end of each quarter, augmented by smaller monthly update books featuring the latest year-to-date information.  Within these smaller monthly books, each supplier's own rows of year-to-date numbers were highlighted. In the front of each book, there were also markings indicating whose numbers were inside the book. The front of the book also included information indicating which other companies were represented in the data, though which number represented each competitor was not revealed.

62.     Agri Stats mailed the reports to customers.  On occasion, Agri Stats reportedly shipped a participant's book to one of its competitors.  At times, suppliers reportedly kept their competitors' books for future reference, which as noted above revealed the identity of that participant given that their numbers were highlighted by Agri Stats in their books.

63.     Mobility within the meat production industries led to a situation in which workers at Defendants and co-conspirators' Producer operations knew the numbers of other regional facilities, removing any anonymization of the data that existed.  Agri Stats would hire industry participants to work in its offices, and then they would return to the industry knowing each of the allegedly "anonymous" numbers.  And during the conspiracy, Agri Stats was aware of these facts.

64.     Agri Stats' critical importance for a collusive scheme in the pork industry lies not only in the fact that it supplies the data necessary to coordinate production limits and manipulate

prices, but also in its stabilizing power.  Price fixing cartels may be unstable in the absence of policing mechanisms, as each individual member of the cartel may have an incentive to cheat on other members of the cartel, for example, by increasing pork production to capture higher prices and market share as other cartel members limit their production.  Agri Stats' detailed production statistics served as an indispensable monitoring function, allowing each member of the conspiracy to police each other's production figures (which were trustworthy because they had been verified) for signs of cheating.

65.     There remains a continuing and real threat of anticompetitive conduct by Defendants and co-conspirators because of, among other reasons, and as described in this Complaint, the continued existence of Agri Stats' reports with Competitively-Sensitive Information, Defendants and co-conspirators' opportunities to collude, the characteristics of the pork market, and the extent to which Producer Defendants and/or co-conspirators continue to exchange Competitively-Sensitive Information with each other through the Agri Stats reports.

**VII.     THE MARKET FOR THE PRODUCTION AND SALE OF PORK WAS CONDUCIVE TO CARTELIZATION**

66.     As explained below, there were one or more conditions and events in the pork industry during the conspiracy, or "plus factors," that made the market for the production and sale of pork conducive to cartelization.

**A.     Pork is a Commodity Product With Inelastic Demand**

67.     Pork products are a commodity or possesses commodity-like characteristics in that the product of one seller is interchangeable with the product of another.  Pork had this characteristic during the conspiracy and at other times relevant to Plaintiffs' claims.  As such, all things being equal, it would not be profitable for Producer Defendants and their co-conspirators to unilaterally increase pork prices in the United States, because a unilateral price increase by any one Producer Defendant or co-conspirator would allow another Producer Defendant or co-conspirator to take substantial market share by simply holding its price.  The commodity or commodity-like characteristic of pork products made the market for the production and sale of pork conducive to cartelization.

68. Markets with a highly inelastic demand can help facilitate collusion as producers have the ability to raise prices without a significant impact on quantity demanded. Price elasticity of demand is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price. A price elasticity of demand value between 0 and -1 indicates there is inelastic demand for the good or service, *i.e.*, a 1 percent increase in price induces a less than 1 percent decrease in quantity demanded. During the conspiracy and at other times relevant to Plaintiffs' claims, the demand for pork was inelastic.

69. To the extent that a relevant market definition is or becomes necessary in this case, it is defined as the market in the continental United States for the production of hogs that are slaughtered to become pork products. As alleged earlier, the Producer Defendants and co-conspirators had greater than an 80% share of this relevant market, *i.e.,* substantial market power, during the conspiracy.

**B.** **The Producer Defendants and Co-Conspirators Controlled the Production and Supply of Pork in the United States, Which Allowed the Conspiracy to Succeed**

70. From approximately 1992 to 2009, the number of hog farms in the United States decreased by about 70%, from over 240,000 farms to 71,000 farms. Despite fewer hog farms, the nation's pork inventory remained relatively stable during this period, averaging about 60 million hogs.

71. During the conspiracy, however, there was increased control over the breeding, production, growing, and processing of pork by the Producer Defendants and co-conspirators through vertical integration and exclusive production contracts with hog farmers. Their vertical integration made it easier for them to collude on the production and price of pork.

72. Vertical integration allowed the Producer Defendants and co-conspirators to control directly the production and supply of pork through their wholly-owned and operated farms, where hogs were raised, fed, and prepared for slaughter. Fully integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when.

1      73.     Under pork production contracts, "a contractor or producer provides pigs or breeding stock, feed, and other services to a producer or grower who manages the hogs at his or her farm until animals are ready for market or transfer to other farms."[21]  This arrangement essentially converts independent farmers into contract employees who perform services for the pork producer. The Producer Defendants and co-conspirators typically paid only fixed  service fees to the farmers, who bore the investment costs of the hog-raising facilities.  The Producer Defendants and co-conspirators typically retained ownership of the hogs and set the terms for how they were raised, allowing them to further control the supply of the pork on the market.  The prevalence and use of contracts for hog production by Producer Defendants and co-conspirators increased significantly during the course of the conspiracy.  For example, during Hormel's 2012 fiscal year, it purchased approximately 97% of its hogs under supply contracts.  By 2017, there reportedly were only a small number of independent producers who sold hogs to the open market for transparency as far as bid prices.[22]

74.     Pork production starts at the farrowing stage – which is the term used to describe a female hog giving birth.  Female hogs used in the farrowing stage are called sows.  Sows will normally have anywhere from 11 to 13 pigs per litter.  With a sow being able to farrow close to three times a year, one sow can have around 36 piglets in one year.  After birth, piglets grown for meat consumption are moved to a nursery for about six to eight weeks, or until the pig weighs upwards of 50 pounds.  At the last stage of production, the pigs will spend around 16 weeks in a finishing barn, reaching a final weight of over 250 pounds.  After the pigs reach their final weight, they are sent to a packing plant to be harvested.  Importantly in the context of this case, due to the nature of the pork production cycle, the reduction of sows – *i.e.*, farrowing hogs – have a significant impact on the supply of pork.

---

[21]     Allen Harper, *Hog Production Contracts: The Grower-Producer Relationship*, Virginia Cooperative, Virginia Cooperative Extension (2009).

[22]     *See e.g.*, 2019 Hormel Annual Report, at 8 ("The live hog industry has evolved to large, vertically-integrated operations using long-term supply agreements.  This has resulted in fewer hogs being available on the case spot market.  Consequently, the Company uses long-term supply contracts based on market-based formulas or the cost of production to ensure a stable supply of raw materials while minimizing extreme fluctuations in costs over the long-term.").

75.  The following diagram shows the path for pork raised for meat consumption from birth through sale to consumers:

**Figure 1: Value Chain of U.S.  Pork Market**



Source: CGGC.

76.  During the conspiracy, Defendant Smithfield was the largest producer and processer of pork in the United States.  At the start of the conspiracy, Smithfield had approximately 1.1 million sows and produced 18.7 million market hogs per year in the United States.  By 2014, Smithfield reportedly had approximately 500 company-owned farms and about 2,190 contract farms in the United States.

77.  Seaboard stated in its 2009 annual report: "In 2009, Seaboard raised approximately 75% of the hogs processed at its Guymon, Oklahoma plant with the remaining hog requirements purchased primarily under contracts from independent producers."[23]  In its 2017 SEC 10-K report, Seaboard stated that it raised "over five million hogs annually primarily at facilities owned by Seaboard or at facilities owned and operated by third parties with whom Seaboard has grower

---

[23]  2009 Seaboard Annual Report, at p. 11.

contracts."[24]  During the conspiracy, Seaboard sold pork produced in Triumph's plant or produced in a plant jointly owned by Seaboard and Triumph.

78.     Clemens Food Group touts its vertical coordination on its website, stating: "Our vertically-coordinated company directly oversees the entire production chain, from the farm all the way to our retail and foodservice customers."[25]  A key part of Clemens' vertical coordination efforts includes utilizing a hog procurement and production subsidiary, Country View Family Farms, which manages a network of 100 farms raising hogs under contract throughout Indiana, New York, Ohio, and Pennsylvania.[26]

79.     JBS's purchase of its predecessor in interest, Cargill, in 2015 allowed JBS to exercise greater control over the production of hogs by acquiring four hog farms and two packing plants operated by Cargill.

80.     Triumph was owned by five of the largest pork producers in the U.S. – Christiansen Farms, The Hanor Company, New Fashion Pork, TriOak Foods, and Eichelberger Farms – as well as Allied Producer's Cooperative, a group of producers in Iowa, Nebraska, Kansas, and Minnesota. The relationship with these owner producers provided for vertical integration and allowed Triumph to control the pork production process from start to finish.

81.     Tyson stated in its 2009 10K Report: "The majority of our live hog supply is obtained through various procurement relationships with independent producers."[27]  Additionally, Tyson raised a number of weanling swine to sell to independent finishers and supply a minimal amount of live swine for its processing needs.

82.     Hormel is a vertically integrated company with control over live hog operations as well as pork processing and production facilities.  Hormel stated in its 2009 annual report: "The

---

[24]     2017 Seaboard 10-K, at p. 2  https://www.sec.gov/Archives/edgar/data/88121/000000881211800012/seb-20171231x10k.htm.

[25]     *See* Clemens Food Group, *Vertically Integrated Purposefully Coordinated* (*available at* http://www.clemensfoodgroup.com/our-company/vertically-coordinated).

[26]     *See id.*; *see also* The Clemens Family Corporation Companies (*available at* http://www.clemensfamilycorp.com/pages/companies.aspx).

[27]     2009 Tyson 10-K, at p. 4, https://s22.q4cdn.com/104708849/files/doc_financials/annual/Tyson_FY2009_10K.pdf.

live hog industry has evolved to very large, vertically integrated, year-round confinement operations operating under long-term supply agreements."[28]  Accordingly, Hormel "uses long-term supply contracts to ensure a stable supply of raw materials while minimizing extreme fluctuations in costs over the long term" accounting for 93% of the hogs purchased by Hormel in 2009.[29]

83.    Each of the Producer Defendants and co-conspirators further controls the manner in which pork is processed, and has the ability to restrict and reduce supply through a number of means, including capacity reductions, controlling slaughter rates, and exports.

84.    Producer Defendants, including Smithfield, Clemens, Tyson, Hormel, Seaboard, Triumph, and JBS sell packaged pork under various name brands.

85.    The volume of U.S. commerce in the pork industry is huge.  The total production value of hogs in the United States is reflected in Figure 2 below for 2009-2019:



Figure 2: US Total Production Value of Hogs 2009-2019 in Billions USD



---

[28]    2009 Hormel 10-k, at p. 32.    https://d18rn0p25nwr6d.cloudfront.net/CIK-0000048465/f625f7ed-f161-478e-94f1-6b1ff37eeb31.html.

[29]    *Id.*

86.   Each Producer Defendant and co-conspirator's annual sales of pork products are also very substantial.  For instance, in 2016, Smithfield reported $5.089 billion of fresh pork sales, and an additional $7.089 billion in packaged pork product sales.[30]  That same year, Tyson reported $4.9 billion in pork sales.[31]  These substantial revenues meant that during the conspiracy, if the Producer Defendants and co-conspirators could successfully fix, increase, stabilize and/or maintain pork prices at artificially elevated levels (which they did), then this would (and did) translated into significant overcharges by Plaintiffs and others and substantial profits for the Producer Defendants and co-conspirators.

**C.   The Market For the Production and Sale of Pork Was Concentrated**

87.   During the conspiracy, the market for the production and sale of pork was dominated by the Producer Defendants and co-conspirators.  As alleged earlier, the Producer Defendants and co-conspirators had more than an 80% share of the U.S. market for the production and sale of pork. But for the conspiracy alleged in this Complaint, the Producer Defendants and co-conspirators would have had to compete on price.

88.   The hog integration sector of the market for pork production is horizontally concentrated (only a few companies buy, slaughter, and process the majority of hogs) and vertically integrated (pork packers have tight contractual relationships with hog producers throughout all stages of production).  Meatpacking concentration levels are among the highest of any industry in the United States, and well above levels generally considered to elicit non-competitive behavior and result in adverse economic performance.

89.   Prior to and during time relevant to the allegations in this Complaint, the pork industry underwent a period of unprecedented concentration, resulting in a small number of pork producers controlling a large amount of market share.  Between 1988 and 2015, just the top four pork producers increased their market share from 34 percent in 1988 to 70 percent by 2018.  As

---

[30]   Smithfield 2016 10-K at 40.

[31]   Tyson 2016 10-K at 27.

1  shown in Figure 3 below, the top four the top four pork producers had market share greater than 60

2  percent during the conspiracy:



Figure 3: Market Concentration of Four Largest Companies

90.    In 1999, Smithfield acquired Carroll's Foods, Inc., which was, at the time, the second

largest hog production company in the U.S., and its affiliated companies and partnerships.  In 2003,

Smithfield acquired Farmland Foods, which was, at the time, the sixth largest pork producer in the

United States.  In 2016, Smithfield announced the acquisition of farm operations in three U.S.

states from Hormel Foods Corp.

91.    In July 2015, JBS announced that it would acquire Cargill's pork business for $1.45

billion.  The acquisition joined the third and fourth largest pork packing companies to surpass

Tyson and became the second largest hog processor in the United States, behind only Smithfield.

As noted above, the acquisition allowed JBS to exercise greater control over the production of

pork, by acquiring four hog farms and two packing plants operated by Cargill.

92.    The Cargill acquisition was completed in October 2015 and resulted in further

consolidation in the industry.  The resulting pork business had pro forma net revenue of

approximately $6.3 billion, and a processing capacity of about 90,000 hogs per day and two

million pounds of bacon per week.  After the acquisition closed, the new JBS-Cargill entity was twice as large as the next largest pork Producer (Hormel), and four times larger than the fifth and sixth largest firms (Triumph and Seaboard, each with under five percent of the national slaughter capacity).

93.     The following timeline summarizes notable mergers and joint ventures between pork Producers since 1995, which led to an increased market concentration:



Figure 4: History of Mergers and Acquisitions

94.     As shown in Figure 5 below, by 2016, the top six pork processors comprised 82% of the total market.  The top two pork processors alone compromised over 45% of the market share, with Smithfield holding the largest overall share of the market at 26%.  On their own, it would be difficult for any of these companies to exercise market power.  However, acting collectively to manipulate the price of pork products, the combined market share of the six largest pork Producers, *i.e.*, the Producer Defendants and co-conspirators, translates into an HHI[32] of 6724 (ignoring other pork processors that comprise the other 18% of the market), which is well above the threshold for highly-concentrated markets.  In other words, if, as alleged in this Complaint, the Producer Defendants and co-conspirators colluded with one another to restrict the domestic supply of pork –

---

[32]     "HHI" means the Herfindahl-Hirschman Index, a measure of market concentration used by the Department of Justice.  *See* https://www.justice.gov/atr/herfindahl-hirschman-index. A HHI value of 1,500 to 2,500 suggests a market is moderately concentrated.  An HHI in excess of 2,500 points suggests a market is highly concentrated.

which they did – then the resulting market concentration of this concerted action gave them more than sufficient power to control the pork market.  Even without combining the largest six pork producers, the pork industry had a "moderately concentrated" HHI of 1532.

### Figure 5: 2016 Pork Processing Market Shares[33]



95.     The concentration level in the pork integration industry was optimal for collusion. WH Group Limited, which acquired Smithfield in 2013, characterized the U.S. pork integration industry as "relatively mature and concentrated."[34]   Both of these conditions – maturity and concentration – made the pork industry more susceptible to collusion.

96.     The level of concentration in the pork integration industry therefore rested in an ideal zone for collusion.  Because the industry was dominated by a relatively small number of pork producers, *i.e.*, the Producer Defendants and co-conspirators, it was feasible for them to manipulate price through an agreement among them, whose market power greatly simplified the organizational complexity of the conspiracy.  Further, because the Producer Defendants and co-conspirators were

---

[33]     Ken Sullivan, *Globalization of Agriculture: An Ownership and Market Perspective* (March 7, 2017).

[34]     WH Group Interim Report, at p. 5 (2017).

incapable of independently controlling pork prices on their own, such an agreement was necessary to artificially inflate pork prices above a competitive level.

97.     Concentration of the industry was also beneficial to the procurement of hogs by the pork processors.  In some regions, consolidation resulted in cases in which only one pork processor was left to buy hogs from independent farmers, leaving the farmers with no leverage when negotiating terms with the pork processors.[35]

98.     In addition to market concentration, market stability is consistent with the conspiracy alleged in this Complaint.  Figure 6 below shows not only that the Producer Defendants and co-conspirators' collective share of the market was high during the conspiracy, but also that their market shares were relatively stable during this period:

**Figure 6: Market Concentration and Market Share Stability**
**U.S. Market Share by Hog Slaughter Capacity[36]**



Figure 6: Market Share of American Slaughter Capacity



_____

[35]     Wise, Timothy A. and Sarah E. Trist, "Buyer Power in U.S. Hog Markets: A Critical Review of the Literature", Global Development and Environment Institute, Working Paper No. 10-04, August 2010, at pp. 3 and 11.

[36]     This data comes from Pork Checkoff and several issues of Hog Farmer.  The figure omits 2008 and 2010 due to data sourcing issues for those years.

COMPLAINT AND DEMAND FOR JURY TRIAL                                                          29

1

2

### D.    There Were Barriers to Entry in the Market For the Integrated Production and Sale of Pork

3

99.    Large barriers to entry kept potential competitors out of the pork integration industry

4

during the conspiracy.   New entry into pork processing was costly and time consuming.

5

Construction of a large-scale slaughter facility would take hundreds of millions of dollars and the

6

additional planning, design and permitting costs were substantial.   In 2012, it cost Cargill $25

7

million just to expand an existing facility.   During the conspiracy, constructing a facility from

8

scratch would have cost considerably more money, totaling hundreds of millions of dollars.[37]

9

Indeed, Seaboard Triumph Foods's 600,000 square foot plant in Sioux City cost $264 million to

10

build.

11

100.    The prevalence of contracts in the market for hogs also served as an entry barrier

12

during the conspiracy.  Most of the hogs produced in the U.S. were sold under multi-year contracts,

13

typically to one of the Producer Defendants or co-conspirators.  In other situations, the processor

14

owned the hog from farrow to finish.  Even if a market entrant had been able to lay out capital for

15

the construction of a new processing facility, it would have had trouble finding enough hogs to

16

operate that facility profitably.[38]

17

### E.    Select Trade Associations Facilitated Collusion

18

101.    Industry trade association and trade group (collectively "trade groups") meetings and

19

events brought together senior executives from Defendants and co-conspirators, and afforded them

20

the opportunity to discuss restricting the pork supply and artificially elevating pork prices.  Against

21

this backdrop, and knowing now that during the conspiracy, the Producer Defendants and co-

22

conspirators were privately exchanging their respective Competitively-Sensitive Information with

23

each other through the Agri Stats reports and signaling or communicating with each other publicly

24

about their intention to restrict pork supply, it is not unreasonable, and indeed is plausible, to

25

26

[37]    *Anticompetitive Impacts of Proposed JBS-Cargill Pork Acquisition* (White Paper), July 2015 at p. 7.

27

28

[38]    Timothy A. Wise and Sarah E. Trist, *Buyer Power in U.S. Hog Markets: A Critical Review of the Literature*, Global Development and Environment Institute, Working Paper No. 10-04 (August 2010), at p. 12.

believe that Defendants and co-conspirators were secretly discussing the collective restriction of the pork supply when their executives met at or incident to these trade group meetings or events.

102.   There is some evidence of this already at or after such trade group meetings or events.  In 2009, after the National Pork Industry Conference (described below), Mark Greenwood, a senior vice president at AgStar, wrote in "Hog Farmer" that the swine industry must reduce sow numbers by at least 300,000 to 500,000, and urged "the larger production systems" to "follow Smithfield's and Tyson's lead on reducing sow numbers."[39]  In July 2010, the industry web site called "Pork Checkoff" stated that pork producers had responded to lower prices in 2009 "by reducing the size of the national herd" and, "[a]s a result, prices have rebounded."[40]

103.   Based on the facts and circumstances present in *this* case, the Producer Defendants and co-conspirators' participation in trade group meetings and events plausibly provided them with cover to engage in conduct in furtherance of their conspiracy.

104.   Examples of pork industry trade groups in which Producer Defendants and co-conspirators participated during the conspiracy and that allegedly provided cover for the collusion include, without limitation: (a) the National Pork Producers Council (whose members included Cory Bollum of Hormel Foods, Don Butler of Smithfield Foods/Murphy-Brown LLC, Chris Hodges of Smithfield Foods, and Todd Neff of Tyson Fresh Meats); (b) the Pork Industry Forum; (c) the National Pork Industry Conference; (d) the World Pork Expo; (e) the National Pork Board (whose members included at least three executives associated with Smithfield (Conley Nelson, Chris Hodges, and Michael Skahill);[41] (f) the National Pork Industry Conference (met annually and included the top pork production systems in North America); (g) the 21st Century Pork Club (met twice per year with industry stake holders and had a rule that "nothing that was said in the meeting was to be repeated outside the group, with the name attached");[42] (h) the International Production

---

[39]   Mark Greenwood, "Costs Drop but Losses Continue," *National Hog Farmer* (Aug. 3, 2009).

[40]   Pork Checkoff, "National Pork Board to meet during National Pork Industry Conference," (Jul. 8, 2010).

[41]   *National Hog Farmer,* "Pork Checkoff names 2019-2020 officers," (Jun 5, 2019) https://www.nationalhogfarmer.com/business/pork-checkoff-names-2019-20-officers.

[42]   Agri Stats – Blair Snyder and Brian  Snyder; Clemens – Doug Clemens, Phil

and Processing Expo (attended by Producer Defendants and co-conspirators); and (i) the North American Meat Institute ("NAMI") and its predecessor, the American Meat Institute ("AMI") (whose members included the Producer Defendants and co-conspirators, whose executives served on its Board,[43] and which sponsored the pork industry's "Annual Meat Conference" attended by senior executives of Defendants and co-conspirators).[44]

105.    During the conspiracy, the AMI and NAMI meetings brought Defendants and co-conspirators together and provided them with cover to discuss pork industry economics.   For example, NAMI and AMI's Annual Meat Conference often included an economic presentation of the meat industry, including pork, by Steve Meyer, Ph.D., President of Paragon Economics until 2015 and then Vice President of Pork Analysis at Express Markets, Inc., a subsidiary of Agri Stats.[45]  In 2017, NAMI sponsored a Meat Industry Summit at which John Nalivka of Sterling Marketing made a presentation about economic issues regarding the meat industry.[46]

## VIII.    DEFENDANTS AND CO-CONSPIRATORS IMPLEMENTED COLLUSIVE, ANTICOMPATITIVE CAPACITY AND PRODUCTION RESTRICTIONS

### A.    Overview of the Restriction of the Pork Supply During the Conspiracy

106.    Defendants and co-conspirators' secret exchange of Competitively-Sensitive Information about each other through Agri Stats in a market with conditions that made it conducive to cartelization made possible their implementation and enforcement of an understanding or

---

Clemens; Hormel – Jim Snee, Stephen Binder, Jeffrey Ettinger; JBS – Andrew Nogueira, Wesley Batista, Martin Dooley, Rich Vesta, Bill Rupp; Seaboard – Gary Louis, Rod Brennerman, Terry Holton; Smithfield – Michael Skahill, Keira Lomardo, Chris Hodges, Robert Manly, Larry Pope; Triumph – Mark Campbell, Rick Hoffman; and Tyson – Tom Hayes, Jim Lochner, Mike Larson, Sara Lilygren, Greg Schweitzer, Donnie Smith.

[44]    "2012 Annual Meat Conference: Registered Attendees," *The Food Industry Association,*   *https://www.fmi.org/forms/meeting/MeetingRosterPublic/viewRoster?meetingId= 7EF210000003D&sortBy=title.*

[45]    *Annual    Meat    Conference,*    "2015    AMC    Brochure,"    at    5, http://www.meatconference.com/sites/default/files/books/2015_AMC_Brochure.pdf;    *Annual Meat Conference,* "2016 AMC Brochure," at 6 http://www.meatconference.com/sites/ default/files/books/2016_AMC_Brochure.pdf and *Annual Meat Conference,* "2017 AMC Brochure," p. 5, http://meatconference.com/sites/default/ files/books/2017_MeatBrochure.pdf.

[46]    Meat   and   Poultry,   *NAMI   Offers   New   Meat   Summit,*   Feb.   16,   2017, https://www.meatpoultry.com/articles/15855-nami-offers-new-meat-summit.

agreement among the Producer Defendants and co-conspirators to fix, increase, maintain and/or stabilize pork prices by restraining the domestic supply of pork.  This Section alleges facts relevant to the start of the conspiracy and then provides a detailed chronology of Defendants and co-conspirators' conspiracy communications.

107.   In the years leading up to the conspiracy, pork production steadily expanded.  As one industry commentator reported in 2007: "Some things you can just take to the bank.  Sow herd expansion among the Pork Powerhouses would fall into that category – even in the face of the biggest run-up in feed prices in history."[47]

108.   This historical trend changed markedly during the conspiracy as Producer Defendants and co-conspirators dramatically shifted their behavior and restricted the pork supply in an act that was against their self-interest unless, as was the case, they had an understanding or agreement to restrict the domestic pork supply through collective action.

109.   As demonstrated in Figure 7 below, at several points during the conspiracy, the pork Producer Defendants and co-conspirators changed their behavior and acted in a concerted way to decrease pork supply.  With their conspiracy in place, in 2009 and 2010, and again in 2013 and 2014, the pork industry cut production.  These industry production decreases, shown by negative annual growth rates, marked a drastic change in the Producer Defendants and co-conspirators' business practices from the pre-conspiracy period between approximately 2001 and 2009, in which pork supply was steadily increasing on a yearly basis.

---

[47]   Freese, Betsy, *Pork Powerhouses 2007: Run-Up In Rations* (Oct. 3, 2007).

**Figure 7: U.S. Annual Commercial Hog Production by Weight, 2000-2020**



110.   These supply cuts were coordinated among Producer Defendants and co-conspirators, and were historic and unprecedented.   For example, in September 2009, Pork Powerhouses – an annual report of the largest pork producers in the United States, published by *Successful Farming* magazine – titled its annual report "Big Boys Cut Back," and reported that "[f]or the first time since the annual Pork Powerhouses ranking was launched in 1994, the nation's largest 25 producers have cut sow numbers.   These companies report 200,000 fewer sows than one year ago, a drop of 6.4%.[48]

111.   These supply cuts were not easily reversible.   For example, as alleged earlier, attempting to replace breeding sows takes considerable time, during which a company could lose meaningful market share to its competitors with no ability to rapidly increase production to retain its customers, unless its competitors also cut their production.   In other words, each Producer Defendant and co-conspirator took significant business risk by restricting output.   Their production restrictions were not economically rational without coordination among them as alleged in this Complaint.

112.   While the Producer Defendants and co-conspirators were restricting pork production, they also further reduced the domestic supply of pork by increasing production exports. The U.S. had been a net exporter of pork for a lengthy period, but those exports have comprised a

---

[48]   Freese, Betsy, *Pork Powerhouses 2009: Big Boys Cut Back* (Sep. 14, 2009).

much larger share of total production in the past ten years.  As shown by Figure 8 below, less than 10% of U.S. pork production was exported in 2000.  However, by 2011, more than 20% was being exported.  Exporting pork was another means by which Defendants were able to reduce the supply available in the United States.

**Figure 8: US Pork Exports as a Percent of Total Production, 2000-2017**



113.   By restricting the supply of pork, even when confronted with increasing demand, Defendants and co-conspirators' common goal was to increase the price of pork and their margins. In 2012, the CEO of Tyson reported that these efforts were successful, stating: "Well, what we've seen happen, and it's about evolving over time, is beef prices have inflated from a reduced supply, increased global demand, same with pork prices inflating from reduced supply and global demand, putting less domestic product on the market."[49]

(1)   Smithfield

114.   In 2008, Smithfield stopped making historical production increases and instead cut its number of sows, reporting: "We are focused on reducing the number of pigs that come off sow

---

[49]   Transcript, Tyson Foods at Goldman Sachs Agribusiness Conference (Feb. 26, 2013).

farms, and making sure the ones that come off are worthy of the investment in feed."[50]  Given its market share, Smithfield knew that as long as a sufficient number of its competitors accepted its offer to reduce production – or not increase production sufficiently to make up for the reduction in production (*i.e.*, maintain production or increase production less than it could have) – then its significant production cuts would reduce heard inventory sufficiently to artificially increase, maintain, fix and/or increase pork prices.  In 2009, Smithfield confirmed publicly – in a call to action to its co-conspirators – that it had already reduced the size of its U.S. herd by two million market hogs annually, and it was initiating a further reduction of 3% of its U.S. sow herd, effective immediately.  The cuts were immediately effective, as Smithfield beat Wall Street analysts' expectations for the 4th quarter of 2009 and forecasted a profit in the current half of its 2010 fiscal year, driven by profits earned from the sale of packaged meats.[51]  Smithfield made additional production cuts in 2010, reporting a cut in its domestic sow herd by 5% (about 45,000 sows).  In 2011, despite increasing margins, Smithfield continued to downsize its sow herd, vowed publicly that it did not intend to increase capacity, and sold its Dalhart, Texas production facility to Cargill, Inc. which had been depopulated by August of 2009 as part of its sow reduction initiative.

115.   Smithfield also focused an increasing portion of its production on exports, with its sister company in China, Shuanghui Development, opening a plant in China in 2015 to turn pork sourced from Smithfield in the U.S. into packaged meat with the Smithfield label.

(2)   Tyson

116.   Between 2008 and 2009, Tyson cut its sows by over 25%, from 70,000 sows to 50,000 sows, marking a significant reduction.  In 2010, Tyson reported a 3.3% decrease in its pork sales volume coupled with increased export sales, which also accounted for a decrease in its capacity utilization rate.  In 2013, Tyson reported a 3.6% decrease in sales volume and decrease its capacity utilization in an effort to "balance[ ] our supply with customer demand."[52]

---

[50]   Freese, Betsy, *Pork Powerhouses 2008: The Big Squeeze* (Sep. 4, 2008).

[51]   *Smithfield Posts Loss, but Beats Forecasts* (*available at* https://www.nytimes.com/2009/12/11/business/11food.html) (last accessed Dec. 13, 2021).

[52]   Chris Harris, "Tyson's Year Off to Good Start" *The Pig Site* (Feb. 4, 2013) https://www.thepigsite.com/news/2013/02/tysons-year-off-to-good-start-1.

(3)    JBS/Cargill

117.    In 2011, JBS reported that in the prior two years, its pork export volume had grown from 15% to 20% of total production at JBS.   Also, after acquiring Cargill's hog production facilities, JBS reduced the number of sows it produced in 2016 despite increased consumer demand.  This production restriction had the effect intended by the conspirators: according to JBS's 2016 annual report, "pork prices were 18% higher year on year at the end of 2016, on the back of increased demand and output restrictions."[53]

(4)    Hormel

118.    In early 2008, Hormel announced that its Corcoran, California hog production division, Farmer John, cut its number of sows in 2008 by about 9,000.  Hormel maintained such reduced production during the conspiracy.  Hormel further reported tonnage reductions for its pork operations in its 2009 Annual Report.  This is consistent with Hormel CEO's statement in January 2009 that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers [of hogs] that we had going through."[54]  Hormel also reported lower sales of pork products in 2013.  In June 2014, it was reported that Hormel reduced its capacity at its Los Angeles plant by 500 head per day.  Hormel reported strong earnings from its pork exports in 2011.

(5)    Seaboard

119.    Seaboard reduced supply in 2013 and, once again, these reductions had their intended effect – higher pork prices.  Despite having an almost identical capacity as in 2012, it reported in 2013 that it had "lower sales volume of pork products in the domestic market," which resulted in "higher prices for pork products sold in the domestic market."[55]  Moreover, in 2017, Seaboard announced that it would delay establishing a second shift at the Seaboard Triumph Foods processing facility.

---

[53]    JBS Annual Sustainability Report, 2016.

[54]    Q1 2009 Hormel Foods Corporation Earnings Call Transcript (Feb.  19, 2009).

[55]    *See* Seaboard 2013 Annual Report.

(6)   Triumph

120.   In September 2008, Christensen Farms, a member of Triumph Foods, reported that it had cut back 11,000 sows.[56]  In 2009, Triumph reported substantial cutbacks of approximately 24,500 sows, representing over 6% of its sow herd, contributing to historic production restraints in the pork industry.[57]  In 2017, Triumph, along with Seaboard, delayed starting a second shift at their joint facility.

(7)   Clemens

121.   In 2011 Clemens reported production of 1,000 fewer sows through its subsidiary Hatfield Quality Meats.  Furthermore, in 2014, Clemens had a competitive advantage over many pork producers in that it had few porcine epidemic diarrhea (PEDv) infected pigs.  However, contrary to what one would expect in a competitive market, Clemens did not use this commercial advantage to its benefit, and it elected not to increase its market share when it clearly had a commercial incentive to do so.

**B.   Timeline of the Conspiracy[58]**

122.   Each of the supply reductions during the conspiracy were a departure from the Producer Defendants and co-conspirators' market behavior prior to the start of the conspiracy. These supply restrictions involved a significant share of the Defendants and co-conspirators' annual production, and they were in contravention of their individual economic self-interest.

123.   While Defendants maintained the secrecy of their unlawful conspiracy, the Producer Defendants and co-conspirators did disclose certain of their supply restriction efforts in public earnings calls and other sources in order to let their conspirators know that they were taking action in furtherance of the conspiracy.  As with their use of Agri Stats, the Producer Defendants and co-

---

[56]   Betsy Freese, *Pork Powerhouses 2008: The Big Squeeze* (Sep.  4, 2008), *available at*  https://www.agriculture.com/livestock/hogs/The-big-squeeze-Pork-Powerhouses-2008_283-ar4443.

[57]   Betsy Freese, *Pork Powerhouses 2009: Big Boys Cutback* (Sep. 14, 2009), *available at*  https://www.agriculture.com/livestock/hogs/pk-powerhouses-2009-big-boys-cut-back_283-ar5700.

[58]   Discovery will be necessary to reveal the full scope and details of the conspiracy. To that end, Plaintiffs reserve the right to supplement or amend this Complaint based on discovery in this case.

conspirators used these public statements to communicate their planned supply restrictions to their competitors in furtherance of the conspiracy, and couched the public disclosures in the pretext of supply costs so as to conceal what was really occurring.

124.    The Producer Defendants and co-conspirators intended for these public statements by their senior executives to influence, impact and cause conspirators to restrict their own pork production so as to keep herd inventory below a level that would increase pork prices sold to Plaintiffs and others.

125.    The lead up to the conspiracy began at least as early as 2008.  In late 2008, Joe Szaloky, director of financial planning and analysis with Murphy-Brown LLC, the entity at Smithfield Foods that dealt with production, said according to the trade press: "[w]e are focused on reducing the number of pigs that come off sow farms, and making sure the ones that come off are worthy of the investment in feed."[59]

126.    In November 2008, Hormel's CEO confirmed during an earnings call that he expected to see a 3% reduction in overall pork supply in 2009.[60]

127.    During Hormel's first quarter earnings call in January 2009, its CEO once again communicated that he expected pork supply to decrease in 2009.  Hormel's CFO confirmed publicly that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers that we had going through."[61]

128.    Throughout 2009, pork industry participants noted the need to follow the supply restrictions imposed in the broiler industry.  For instance, in February 2009, Mark Greenwood, the vice president of AgStar, an agricultural lender, called on U.S. pork producers to follow the lead of the broiler and dairy industries by reducing production, noting that the U.S. pork industry needed

---

[59]    Freese, Betsy, *Pork Powerhouses 2008: The Big Squeeze* (Sep. 4, 2008).

[60]    Q4 2008 Hormel Foods Corporation Earnings Call Transcript (Nov. 25, 2008).

[61]    Q1 2009 Hormel Foods Corporation Earnings Call Transcript (Feb. 19, 2009).

to reduce the sow herd by 5-10%, which at the low end would mean reducing the nation's sow herd by 300,000 sows.[62]

129.   By January 2009, Hormel had reduced its sow numbers from 63,000 to 54,000.  In order to accomplish this reduction, Hormel sold sows in California and switched farms to finishing.

130.   In January 2009, Tyson stated that the capacity utilization of its pork processing plants was 90% for the quarter, down from the previous year's rate of 94%.[63]  This indicated that Tyson was reducing the amount of pork that it processed in its plants.  Tyson stated that it would "continue to watch forward hog supplies and make adjustments accordingly."[64]

131.   In February 2009, Hormel stated: "We still do not expect to see a reduction in the supply of hogs in fiscal 2009[.]"  In addressing whether slaughter would be cut back, Hormel said that "you look at the opportunity to reduce your production numbers and we've certainly ... look[ed] for opportunities ... where we could reduce the numbers that we had going through ...."  Hormel further emphasized that "if there were free market hogs that normally we would be bidding on, we're not looking to take them in...."[65]

132.   In February 2009, Smithfield said that it would close six processed meat plants.

133.   In May 2009, Tyson stated that its capacity utilization rate for its pork processing plants for the quarter was 87% down from the previous year's rate.[66]  Tyson described pork "supplies coming down" and that "the worldwide suppliers of pork are still down."[67]

134.   In May 2009, the CEO and President of Smithfield reportedly stated:

> In terms of chronology of how I say we proactively managed this business, in February of last year--February of '08, not February of '09--we made the decision with the over-supply of livestock to take the leadership position and start reducing our sow herds because we saw the overproduction and the

---

[62]   Dale Miller, "Industry's Stimulus Package – Cull Sows," *National Hog Farmer,* (Mar 15, 2009.

[63]   Q1 2009 Tyson Foods, Inc. Earnings Conference Call (Jan. 26, 2009).

[64]   *Id*.

[65]   Q1 2009 Hormel Foods Corporation Earnings Conference Call (Feb. 19, 2009).

[66]   Q2 2009 Tyson Foods, Inc. Earnings Conference Call (May 4, 2009).

[67]   *Id*.

oversupplies of the hogs into the market, which was driving our hog market down. We started a reduction of 50,000 sows and 1 million of our 18 million pigs, we started taking out of the system.[68]

135.   In May 2009, Hormel confirmed that "we still see a contraction in the overall supply of hogs for the year but not as much as we originally anticipated. And I would expect that prices will be somewhat less then [sic] last year, but higher then [sic] what we've seen in the first half of the year."[69]

136.   In June 2009, the CEO of Smithfield reportedly stated that the current cuts were not enough, that more were needed to "fix" the hog industry, and that "[s]omebody else has got to do something:"

> One of the things that we're doing is managing what you can do and the 3% relates to one of our operations and it's our -- I'll tell you, it's our Texas operation that sells pigs to Seaboard. Seaboard knows that. ... That 3%, let me say that, our 3% will not fix the hog industry. That part I'm confident of. Somebody else has got to do something. We cut 13%. The first 10% didn't fix it. I don't think us going from 10 to 13 is going to fix the hog business.[70]

137.   During the same call in June 2009, the Smithfield CEO, when asked to describe his expectations for whether the rest of the industry would "liquidate" (*i.e.*, cut production), he described how at the 2009 Pork Expo in early June 2009, cutting supply was the "key subject of the discussion of every producer," adding that such supply reduction is "something [that] has got to happen. And so that's very positive."[71]

138.   In July 2009, Smithfield's CEO reportedly stated: "I strongly believe that the hog production industry has reached an inflection point where, due to deep and extended losses, liquidation is now a recognized reality by all in the industry. To date, Smithfield has already reduced the size of its U.S. herd by two million market hogs annually, and we are initiating a further reduction of 3% of our U.S. sow herd, effective immediately. This reduction, combined with the

---

[68]   Smithfield Foods at BMO Capital Markets Agriculture, Protein & Fertilizer Conference – Final (May 13, 2009).

[69]   Q2 2009 Hormel Foods Corporation Earnings Conference Call – Final (May 21, 2009).

[70]   Q4 2009 Smithfield Foods Earnings Conference Call (June 16, 2009).

[71]   *Id.*

additional cuts by our fellow producers should shrink supply to a point where the industry can return to profitability.  This liquidation is long overdue."[72]

139.    In August 2009, Tyson Foods, Inc. Chief Operating Officer confirmed:

> Hog supplies will be down in Q4 year over year but still adequate.  We do expect to see liquidation accelerate and pork production decrease into 2010 and beyond to improve producer profitability.  We will continue to watch forward hog supplies to drive more exports, monitor demand, focus on cost, mix, and pricing to generate revenue.[73]

He continued: "Looking forward in the pork segment we will see a gradual decline in hog supplies to the first half of our fiscal year with additional year over year declines into Q3 and Q4."[74]

140.    Tyson's 2009 10K Report further stated: "We expect to see a gradual decline in hog supplies through the first half of fiscal 2010, which will accelerate into the second half of fiscal 2010, resulting in industry slaughter slightly higher than 2007 (or roughly 4% less than fiscal 2009)."[75]

141.    In August 2009, JBS's CEO communicated the start of JBS's participation in hog liquidation efforts.  He reportedly stated: "[W]e are seeing the start, we are seeing some increase in – not increase, we are seeing some more [hog] liquidation.  So we think we will continue to see the margin in the processing side strong this whole year.  But in the pork producers, it will be a real challenge for them, producers for, in the next quarters."[76]

142.    In September 2009, the CEO of Smithfield reportedly stated that he had conversations with "sizable large producers" and that they would be doing some liquidation:

> We can't solve the problem.  But the answer to that is yes, I have had conversations with several sizable, more than sizable large producers, in fact

---

[72]    *Pig Progress,* "Smithfield reduces pig herd to cover losses," June 18, 2009 https://www.pigprogress.net/Home/General/2009/6/Smithfield-reduces-pig-herd-to-cover-losses-PP003085W/.

[73]    Q3 2009 Tyson Foods, Inc.  Earnings Conference Call (August 3, 2009).

[74]    *Id.*

[75]    *See* Tyson 2009 10K Report, at 20.

[76]    Q2 2008 JBS Earnings Conference Call (Aug. 13, 2009) https://sec.report/otc/financial-report/24091.

1

2

very large producers, and I would tell you they are doing some liquidation. But again, I don't think they can solve it.

3

4

5

I think this industry has got to solve it collectively.  I do believe everyone is now looking, and when I'm talking to people who are financially extremely strong and they are cutting back, that's got to be a statement about those people who are not financially strong.  But the answer is, yes, there are others cutting back.  We're not the only one.[77]

6

143.    The other Producer Defendants and co-conspirators agreed to or accepted

7

Smithfield's offer or exhortation for the "industry" to cut production.  During 2009, Triumph

8

reduced the number of sows that it had from 396,000 to 371,500.  In particular, Triumph reduced

9

the number of sows by 14,500 at its Christensen Facility, 4,000 at its New Fashion Pork Facility,

10

and 5,000 at its Eichelberger facility.[78]  Notably, Triumph and Seaboard had a longstanding

11

marketing agreement in which hogs processed by Triumph were marketed by Seaboard.[79]  Thus,

12

the reduction in supply of sows raised by Triumph may result in a reduction in the amount of pork

13

that was sold by Seaboard.

14

144.    During 2009, Tyson reduced its number of sows from 70,000 to 52,000.  In

15

particular, Tyson sold five farms and sent the sows to slaughter.  Tyson's 2009 10-K report further

16

stated: "We expect to see a gradual decline in hog supplies through the first half of fiscal 2010,

17

which will accelerate into the second half of fiscal 2010, resulting in industry slaughter slightly

18

higher than 2007 (or roughly 4% less than fiscal year 2009)."[80]

19

145.    In November 2009, Hormel stated that "we've seen about a 2% liquidation" in

20

hogs.[81]

21

22

---

23

[77]    Event Brief of Q1 2010 Smithfield Foods Earnings Conference Call (Sept. 8, 2009).

24

[78]    Betsy Freese, *Pork Powerhouses 2009*, Successful Farming (2009).

25

26

[79]    According to Seaboard Corporation's 2010 Form 10-K, filed with the Securities and Exchange Commission, "Seaboard's Pork Division has an agreement with a similar size pork processor, Triumph Foods LLC (Triumph), to market substantially all of the pork products produced at Triumph's plant in St. Joseph, Missouri.

27

[80]    Tyson Foods, Inc. 10-K Annual Report, at 20 (2009).

28

[81]    Q4 2009 Hormel Foods Corporation Earnings Conference Call (Nov. 24, 2009).

146.    In December 2009, the CEO of Smithfield confirmed that it had done its "fair share" to cut supply and communicated that others needed to continue cutting supply to "put this industry back in balance:"

> We continue to take a leadership role there and we have continued to take sow reductions and liquidation in our own herds and all of that has essentially been completed from Smithfield's side, so I think we've certainly done more than our fair share in terms of what this industry needs...I can tell you that I know in the east, its [sic] been pretty public about some of the producers on the east coast that have been cutting back besides ourselves.  We are getting a little more information in the Midwest and I am saying that I have not seen the significant Midwest reduction that would probably be needed to put this industry back in balance.[82]

147.    In March 2010, when asked about fourth quarter and 2011 volumes for pork, the CEO of Smithfield reportedly indicated that further cuts were still to come:

> Hog volumes for the rest of the fiscal year.  That's going to have the impact starting next fiscal year when there is going to be 13,000 less.  But I think we'll pick up some of that in our other operations.  But I think 8,000 or 9,000 or 10,000 of those a day will disappear from our operations and that represents about 8% of our, 8% of the hogs will be down.  That's for also the fresh pork side.[83]

148.    On March 8, 2010, JBS's CEO mentioned JBS's reduction in hog supply as a driver of profitability, and he stated that these efforts were resulting in protein shortages.  He stated:

> combination of reduction in supply for cattle, for hogs and for chicken and in the other hand the improvement and increase in consumption in the emergent markets we are very optimistic about our business, about the margin that we will see a strong demand and this reduction in supply, so we believe that we will see some shortage in protein going forward.[84]

Despite having the economic incentive (increased demand) to increase supply and capture market share, JBS adhered to the conspiracy to artificially elevate pork prices by restricting the hog supply.

149.    As of March 2010, U.S. pork production was noted to be down 7%, with 6% of the reduction coming from a reduction in slaughter and 1% from lower market weights.  The Producer

---

[82]    Q2 2010 Smithfield Foods Earnings Conference Call – Final (Dec. 10, 2009).

[83]    Event Brief of Q3 2010 Smithfield Foods Earnings Conference Call – Final (Mar. 11, 2010).

[84]    JBS Q4 2009 Earnings Conference Call (Mar. 8, 2010).

Defendants and co-conspirators also were reported to have increased exports 8% by March 2010, which was expected to lead to higher hog prices.

150.   In May 2010, Tyson stated in its Q2 2010 earnings conference call: "Worldwide protein supplies and US domestic availability are expected to remain below '08 and '09 levels.  We have seen good interest in Beef and Pork exports to a variety of global destinations."[85]  Similarly, in August 2010, Tyson stated in its earnings call that "Pork supplies in 2011 are anticipated to be below their peak supplies in calendar 2008 and 2009, and most projections show no material changes compared to 2010."[86]

151.   In August 2010, Hormel stated: "Our hog supply is down 3 to 4%."[87]

152.   In September 2010, Smithfield stated in a press release that the closure of its Sioux City plant in April 2010 had led to an 11% reduction in its processing rate from the prior year. Smithfield further stated: "Industry wide, slaughter volumes were down 3.5%," and "Lower industry slaughter levels are expected to persist well into the company's second quarter."[88] Smithfield's quarterly results from that time reflected that the volume reductions "should help stabilize prices at healthier levels than fiscal 2010."

153.   Defendants acknowledged access to information that allowed them to know that the supply of pork would not be increasing.  For example, in December 2010, the CEO of Smithfield reportedly stated:

> We certainly compare ourselves to our competitors as best we can.  Given the information we think we have public plus what we think we know privately, how many they kill, what their processing levels are and things like to.  This is information you may not quite have.  And we have been certainly impressed with how our competitors have been able to achieve margins that we have not been able to achieve because our fresh pork competes very competitively with theirs.[89]

---

[85]   Q2 2010 Tyson Foods, Inc. Earnings Conference Call (May 10, 2010).

[86]   Q3 2010 Tyson Foods, Inc. Earnings Conference Call (UG. 20, 2010).

[87]   Q3 2010 Hormel Foods Corporation Earnings Conference Call (Aug. 20, 2010).

[88]   *Smithfield Foods Reports Record First Quarter Results*, Smithfieldfoods.com (Sept. 8, 2010).

[89]   Event Brief of Q2 2011 Smithfield Foods Earnings Conference Call – Final (Dec. 2010).

As alleged above, Smithfield had access to Competitively-Sensitive Information from its competitors through, among other means, the Agri Stats reports, which allowed it to know confidential supply information from and about its competitors.

154.    Supply level information regarding competitors allowed Defendants and co-conspirators to know that supply would not increase in the future, given the lifecycles of the animals. Based on this knowledge, in November 2010, Hormel's CFO stated that she did not think the industry would see large scale expansion given profitability for the pork Producers.[90]

155.    In February 2011, Tyson's chief operating officer (COO) stated:

> I think there's still a widely held belief that our Beef and Pork profitability isn't sustainable.  I want to again explain why we don't believe that's true.  If we look at supply, current cattle and hog production levels can't change much in 2011 because of the limits of the animal's life cycle.[91]

156.    In the face of ever-increasing margins, when asked whether the type of profits would continue, in March 2011, Smithfield's executives reportedly confirmed to their competitors that it would not increase capacity, even in the face of the clear profitability:

> LARRY POPE: We closed last night at nearly $64 for hogs.  Yet we are projecting over the next 90 days we will be up another 20% from that.  I mean those are big numbers to get the meat prices in the retail and food service case to cover that....
>
> HEATHER JONES: So you are just striking a note of caution because you know it can't stay this way indefinitely; but it's not that you foresee this reversion to that norm over the near term?
>
> BO MANLY: I don't see it on the horizon, on the foreseeable horizon.  We are still going to have -- should have good margins, but I can't believe --
>
> LARRY POPE: Heather, we are sitting here today, we are halfway -- closing in on halfway through our fourth quarter, and we have had very good margins through February and March, through today.  We have got double-digit margins today.
>
> BO MANLY: It will correct itself over the long run, because this type of return on investment would attract capital, would attract expansion, and we kill more pigs and drive the margins lower.  So it will either happen by itself or someone is going to build a plant.

---

[90]   Q4 2010 Hormel Foods Corporation Earnings Conference Call – Final (Nov. 23, 2010).

[91]   Q1 2011 Tyson Foods Earning Conference Call – Final (Feb 4, 2011).

HEATHER JONES: All right, okay.  Thank you.

LARRY POPE: You get two-year visibility on that, though.  You get to know when somebody is building a plant because they have got to file for a permit and they have actually got to build the thing....  And by the way, we are not going to build a new plant to expand capacity.[92]

157.   In March 2012, the VP of Finance and chief accounting officer of Smithfield reportedly stated that no one in the industry would be "real excited about adding capacity"[93] when the losses of 24 to 36 months ago were considered:

Nonetheless, you see some pretty significant fluctuations.  Just two weeks ago, I think we had -- there were rumors the Chinese buying corn, and boom, all of a sudden the corn market is up $0.20, $0.30.  So there is some volatility there.  And what I would tell you is that keeps a lid on pork production.  The pork guys in the United States have not forgotten 24 or 36 months ago when there were significant losses in the industry.  There is no one going to be real excited about adding capacity, adding sows at a time when we've got such volatility.[94]

158.   By May 2012, pork industry observers were noting that the reductions in slaughter capacity meant the Producer Defendants and co-conspirators may not have enough capacity to slaughter expected hog levels by the fall.  In fact, Steve Meyer of Paragon Economics noted that slaughter capacity would not keep up with hog capacity through late 2013 given that Producer Defendants and co-conspirators were holding their slaughter levels constant.

159.   In September 2013, Joe Szaloky, Vice President of Procurement and Business Development for Smithfield, confirmed the company's intention to maintain its sow number, not adding any more.[95]

---

[92]   Event Brief of Q3 2011 Smithfield Foods Earnings Conference Call – Final (Mar. 2011).

[93]   Smithfield Foods at Barclays Bank High Yield Bond and Syndicated Loan Conference – Final (Mar. 26, 2012).

[94]   Smithfield Foods at Barclays Bank High Yield Bond and Syndicated Loan Conference – Final (Mar. 26, 2012).

[95]   Betsy Freese, *Pork Powerhouse 2013: Disease Hits, Growth Continues*, Successful Farming (Sept. 29, 2013), *available at* https://www.agriculture.com/livestock/hogs/pk-powerhouses-2013-disease-hits-growth_283-ar34203.

160.   In December 2013, Robert Manly of Smithfield emphasized that coordinated industry action was necessary to "balance supply and demand:"

> So I think you really need to look at the overall industry balance of supply and demand to be able to determine, and the industry move prices up and collectively as a group.  We've got limited ability to do it ourselves if the rest of the industry doesn't follow, but the consumer tends to be willing to pay proportionately higher values for their pork meat when small increments of supply are withdrawn from the marketplace.[96]

161.   On May 15, 2013, JBS's CEO continued to demonstrate JBS's ability to constrain the pork market.  During a quarterly earnings call he stated: "[i]n pork, given some restrictions in supply we have been able to pass price through the system and we are seeing good margins in our pork business….  So this is a clear sign that we have been able to pass price increase in chicken and pork and not in the same extent with beef.[97]

162.   The Producer Defendants and co-conspirators further refused to increase their capacity and gain market share even when market fundamentals and economics dictated otherwise.  For example, during the 2014 PEDv epidemic, which caused industry supply disruptions, Eric Haman, Clemens Food Group's communication manager, stated the disease "had a very minimal impact on our hog flow, especially when you compare it to others in the industry."  He stated: "That's one of the many benefits of raising hogs in Pennsylvania, since we have a much lower density of pigs than other states, which decreases the risk of (a virus) like this."[98]  Yet, in furtherance of their conspiracy, Clemens did not take advantage of having few PEDv infected pigs.  Instead of attempting to increase its market share, it stayed the course with its fellow competitors.

163.   Defendants and co-conspirators' conspiracy was yielding substantial profits by 2014.  In October 2014, the Pork Powerhouses report stated: "Hogs made history this summer.  Pork producer profits were, quite simply, enormous – averaging $82 profit for each hog marketed

---

[96]   Q2 2014 Smithfield Foods Earnings Conference Call (December 23, 2013).

[97]   Q1 2014 JBS Earning Conference Call (May 15, 2014).

[98]   Kyle Bagentose, *Pig Virus Has Ability To Affect Local Herds*, Bucks County Courier Times (May 4, 2014).

in the third quarter."[99]  The report also noted: "Joe Szaloky, vice president of business development and planning for Smithfield, is confident about profit during the next year, but 'concerned 2016 could be "problematic" if the industry expands too fast.  The PED virus trimmed supply, but higher market weights helped compensate.'"[100]

164.  In early 2015, Pig International noted the continuing problem of available daily slaughter capacity limiting the ability to expand significantly pork production.  Specifically, pork producers rushed to sign contracts with Producer Defendants and co-conspirators that would protect them if production exceeded slaughter capacity as some feared.

165.  In February 2017, Seaboard and Triumph announced plans to expand their joint pork processing facility in Sioux City, Iowa, operated by their 50/50 joint venture, Seaboard Triumph Foods, LLC, to include a second shift.[101]  In announcing the potential second shift, Mark Porter, Seaboard Triumph Foods Chief Operating Officer, stated: "The timing of the expansion for a second shift is a result of growing demand for the Seaboard Foods line of quality pork products as well as ongoing growth in the industry."[102]   However, in furtherance of the conspiracy, Triumph/Seaboard postponed the addition of a second shift.[103]

## IX.   ABNORMAL PRICING DURING THE CONSPIRACY DEMONSTRATES THE SUCCESS OF THE CONSPIRACY

166.  Beginning in approximately 2009, the pork industry showed abnormal price movements, *i.e.*, increases in prices for the average hog whole price unexplained by increases in costs.  All of these pricing measurements show a significant break between pricing prior to 2009

---

[99]    Freese, Betsy, *Pork Powerhouses 2014: High on the Hog* (Sep. 30, 2014).

[100]    *Ibid.*

[101]    Farm Futures, *Seaboard Triumph Foods Will Add Second Shift At Plant Under Construction* (Feb. 24, 2017) (*available at* https://www.farmprogress.com/hog/seaboard-triumph-foods-will-add-second-shift-plant-under-construction).

[102]    Farm Futures, *Seaboard Triumph Foods Will Add Second Shift At Plant Under Construction* (Feb. 24, 2017) (*available at* https://www.farmprogress.com/hog/seaboard-triumph-foods-will-add-second-shift-plant-under-construction).

[103]    Jeff DeYoung, *Pork Packing Capacity Faces Delay to Growth*, Iowa Farmer Today (June 2, 2018) (*available at* https://www.agupdate.com/iowafarmertoday/news/livestock/pork-packing-capacity-faces-delays-to-growth/article_f86fde7e-64dc-11e8-b288-475ac8083072.html).

and pricing after 2009, supporting the plausibility of a conspiracy to increase prices of pork. These abnormal pricing movements can be measured in a number of ways, including: (i) the average live hog price, (ii) the pork cut-out composite price, (iii) the Producer Defendants and co-conspirators' margin during the conspiracy; and (iv) the Producer Defendants and co-conspirators' revenues before and during the conspiracy. Each of these measures supports Plaintiffs' allegations that Defendants and co-conspirators conspired to restrict production and otherwise acted in a concerted manner to artificially increase pork prices in the U.S.

(a)     The Average Hog Wholesale Price Experienced an Unprecedented Increase Beginning in 2009

167.    According to aggregate prices published by the USDA, prices for pork products were less than $1.40/lb from 2000 to 2009, and the hog market yearly average price was at times substantially less. Thereafter, prices increased dramatically, rising to more than $1.80/lb in 2014, and never dropping below $1.40/lb again. The movements in the price of pork before and during the conspiracy are illustrated in Figure 9 below reflecting average hog wholesale prices in cents per pound between 2000 and 2018.

**Figure 9: Average Hog Wholesale Prices in Cents per lb., 2000-2018**



1    168.    Publicly-available data also demonstrates that Producer Defendants and co-

2    conspirators' earnings increased steadily over the years 2009 to 2016, with a slight decline in 2017,

3    demonstrating an unusual increase in profits resistant to changes in price during the conspiracy.

4    These substantial profit increases bear the hallmarks of coordinated efforts to constrain supply

5    below demand.

6                (b)    The Producer Defendants and Co-Conspirators' Revenues Increased
                        Beginning in 2009, Even Taking Into Account Their Specific Costs
7

8    169.    Upon information and belief, an examination of the spread between pork revenue

9    and pork-related costs (*i.e.*, costs of goods sold plus operating costs) for two of the largest Producer

10   Defendants (Tyson and Smithfield) – which can be used as a proxy for measuring the spread

11   between the Producer Defendants producer's price of wholesale pork and its hog costs – confirms

12   a divergence between revenue and costs at the approximate start of the conspiracy.  This divergence

13   in revenue and costs starting in 2009 reflects the beginning of abnormal pricing in 2009.

14   170.    Specifically, such an examination shows a break in Tyson's revenues and costs

15   around the start of the conspiracy: from 2001 to 2009, Tyson's average profit on pork was 3.7

16   percent; from 2010 to 2017, Tyson's average profit on pork jumped to 8.7 percent.

17   171.    The same analysis for Smithfield shows a similar break in revenues and costs

18   beginning at the start of the conspiracy: from 2004 to 2009, Smithfield's average profit on pork

19   was 3.2 percent; from 2010 to 2016, Smithfield's average profit on pork increased to 6.3 percent.

20   172.    These analyses of the spread between costs and prices relate solely to each Producer

21   Defendant's pork segment, and thus confirms that rising costs in pork production do not explain

22   the increases in price seen during the conspiracy.

23   **X.    THE CONSPIRACY WAS EFFECTIVE IN INCREASING THE PRICE OF PORK
             SOLD TO PLAINTIFFS AND OTHERS IN THE UNITED STATES**
24

25   173.    As explained below, the conspiracy was effective in artificially and substantially

26   elevating the price of pork sold to Plaintiffs and others in the U.S.

27   174.    The Bureau of Labor Statistics tracks commonly purchased products in its Consumer

28   Price Index ("CPI").  From the end of 2009 to the end of 2020, the CPI for all food products

increased approximately 18.0 percent.[104]  Over the same period, prices for pork – including bacon, ham, and other pork products – have increased substantially during the conspiracy.  The graphs and information below provide examples showing how pork prices have increased at substantially higher rates, since the conspiracy began in 2009, than prices for food products as measured by the Bureau of Labor Statistics.  The information that follows is a proxy for the artificially higher prices that each Plaintiff paid for pork because of and during the conspiracy.

175.  For example, the price of a pound of bacon has increased from $3.57 at the end of 2009 to $5.83 at the end of 2017, an increase of 63.3 percent.  Figure 10 below shows the extent that prices for a pound of bacon increased dramatically during the conspiracy period compared to general food prices.[105]



Figure 10: Price Index for Bacon and Food
Indexed to set Jan 2009 = 100



---

[104]    U.S. Bureau of Labor Statistics, Consumer Price Index for All Urban Consumers: Food at Home in U.S. City Average [CUSR0000SAF11], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/CUSR0000SAF11, November 30, 2021.

[105]    U.S. Bureau of Labor Statistics, Average Price: Bacon, Sliced (Cost per Pound/453.6 Grams) in U.S. City Average [APU0000704111], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/APU0000704111, Nov. 30, 2021.

176.   Similarly, the CPI for other pork products, excluding canned ham and luncheon slices, show a marked increase during the conspiracy, moving from $2.05 per pound at the end of 2009 to $2.99 at the end of 2020 (approximately 45.9 percent).[106]

177.   Further, the CPI for another commonly purchased consumer item – ham – shows an increase from $2.13 in December of 2009 to $3.53 in January of 2021 (or 65.7 percent).[107]

## XI.   THE RESULTS OF THE DOJ'S CRIMINAL INVESTIGATION IN BROILER CHICKENS SUPPORTS AN INFERENCE OF THE EXISTENCE OF A SIMILAR CONSPIRACY IN THE PORK INDUSTRY

178.   The U.S. Department of Justice Antitrust Division ("DOJ") has an ongoing criminal antitrust investigation into anticompetitive conduct in the broiler chickens industry.  The DOJ has indicted numerous current and former poultry industry executives, including from Pilgrim's Pride, which is a majority owned by JBS USA Food Company Holdings, the parent of JBS.

179.   On February 23, 2021, Pilgrim's Pride pled guilty to charges brought by DOJ for "participating in a conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States, in violation of the Sherman Antitrust Action, 15 U.S.C. § 1" from "at least as early as 2012 and continuing through at least 2017," and agreed to pay approximately $107 million in a criminal fine.

180.   Tyson, after being served with a grand jury subpoena in April 2019 in DOJ's broiler chicken investigation, applied for leniency from prosecution under DOJ's Corporate Leniency Program, pursuant to which Tyson must, in order to avoid criminal prosecution and fines, admit to having participated in activity constituting a criminal antitrust violation and fully cooperate with DOJ.

181.   The guilty plea by Pilgrim's Pride and Tyson's grant of leniency in DOJ's criminal price-fixing investigation in the broiler chicken industry serve as a "plus factor" supporting the

---

[106]   U.S. Bureau of Labor Statistics, Average Price: All Other Pork (Excluding Canned Ham and Luncheon Slices) (Cost per Pound/453.6 Grams) in U.S. City Average [APU0000FD4101], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/APU0000FD4101, Nov. 30, 2021.

[107]   U.S. Bureau of Labor Statistics, Average Price: All Ham (Excluding Canned Ham and Luncheon Slices) (Cost per Pound/453.6 Grams) in the Midwest Census Region - Urban [APU0200FD2101], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/APU0200FD2101, Nov. 30, 2021.

plausibility of the pork industry conspiracy alleged in this Complaint, particularly given the similar structural characteristics between the broiler chicken industry and the pork industry.

182.   In addition, upon information and belief, the same antitrust policies and practices that resulted in antitrust violations by Pilgrim's Pride and Tyson with respect to broiler chickens governed JBS's and Tyson's conduct with respect to pork and the conduct alleged herein.

183.   Pilgrim's Pride and Tyson's antitrust violations concerning broiler chickens were concealed and only established by DOJ's criminal investigation, just like the alleged conduct in this Complaint has been concealed by Defendants, as discussed below.

**XII.   PLAINTIFFS' CLAIMS ARE TIMELY**

184.   Plaintiffs' Sherman Act and PSA claims have been brought within the applicable statute of limitations period.

185.   Plaintiffs' Sherman Act claims are timely because the filing of the first class action on June 29, 2018 suspended the running of the statute of limitations on Plaintiffs' claims against Defendants from that date until the date of this Complaint.  That class action has now been centralized with the other cases in *In re Pork Antitrust Litigation*, MDL 2998 and Civil Case No. 19-1776 (D. Mn.).

186.   Plaintiffs' Sherman Act and PSA claims are timely because, throughout the conspiracy period, Plaintiffs directly purchased pork from one or more Producer Defendants and co-conspirators at prices artificially (*i.e.*, unlawfully) elevated by them because of the conspiracy.

187.   Plaintiffs' Sherman Act and PSA claims are timely because, as alleged above, the conspiracy that started in approximately 2009 continued in force and effect (after June 28, 2014) until at least June 28, 2018, if not later, with an effect on price that lingered thereafter.

188.   Plaintiffs' Sherman Act and PSA claims are timely because, as alleged above, overt actions by Defendants and co-conspirators in furtherance of the conspiracy occurred after June 28, 2014 and continued until at least June 28, 2018, if not later, including, without limitation: (a) Defendants and co-conspirators unlawfully coordinated to restrict pork production, including, without limitation, using the Agri Stats reports to exchange Competitively-Sensitive Information with each other to monitor and enforce the conspiracy in 2015, 2016, 2017 and 2018 (if not later);

(b) Clemens did not attempt to take advantage of the 2014 PEDv epidemic by increasing market share, although its hogs were largely unaffected by the epidemic and, had it acted rationally, it would have increased production to increase its market share for the year; (c) after it acquired Cargill's pork enterprise in approximately October 2015, JBS opted to decrease supply despite increased consumer demand; (d) in 2017, Seaboard and Triumph postponed expansion of facilities despite publicly acknowledging a growing demand and growth in pork consumption that would have supported expansion; and/or (e) in 2015, 2016, 2017 and 2018, Producer Defendants and co-conspirators coordinated in the export of pork.

189.   Each of the foregoing overt acts was a new and independent act in furtherance of the conspiracy and not merely a reaffirmation of a previous act.

190.   Each of the foregoing overt acts, or one or more of them in combination, inflicted new and accumulating injury on each Plaintiff.

191.   Defendants and co-conspirators' parallel conduct as alleged above, including their coordinated restriction of the domestic pork supply, would not have occurred in 2015, 2016, 2017 and 2018 (or later) had the conspiracy been disbanded, but it was not.

192.   "Plus factors" supporting the existence of the conspiracy were still present in 2015, 2016, 2017 and 2018, if not later, including, without limitation, pork remained a commodity product with inelastic demand; the Producer Defendants and co-conspirators wielded substantial market power because of their high collective market share and industry concentration; there remained barriers to other producers entering the domestic market for the production of pork; and/or trade group meetings and events occurred that provided Defendants and co-conspirators with the opportunity to conspire, which they did.

193.   Plaintiffs' Sherman Act and PSA claims are timely because each of them did not know of (and could not have reasonably discovered) the existence of the conspiracy alleged in this Complaint – in the case of the Sherman Act claims, at least four years or more before June 28, 2014 – and in the case of the PSA claims, at least four years before filing this Complaint – because of Defendants and co-conspirators' active concealment of their conspiracy as alleged below. Defendants and their co-conspirators' affirmative and fraudulent concealment of their unlawful

conspiracy as described in this Complaint tolled the statute of limitations for each Plaintiff's Sherman Act and PSA claims.

194.   During the period more than four years before the filing of this Complaint, including the period before June 28, 2014, Producer Defendants and co-conspirators publicly and pretextually claimed that increases in their pork production input costs or other seemingly plausible reasons were responsible for increased pork prices when, in fact, they were not.  This created the illusion that the price of pork that they sold to Plaintiffs was competitive, when, in fact, it was not because their pork prices were the result of the conspiracy.

(a)   For example, the CEO of Smithfield insisted at the USDA agricultural outlook forum in Arlington, VA on February 27, 2008: "Five dollar corn is reality when we thought four dollar corn would never be a reality."  Pope directly tied increases in these costs to increased pork prices, indicating: "I think we have to adjust to an increased input cost and a grain cost which is going to result in higher priced meat…."  Other Producer Defendants and co-conspirators followed this same pattern, explaining price increases in terms of underlying costs.

(b)   For instance, in 2012, Tyson's CEO insisted that Tyson Foods "need[ed] to get our pricing improvements in order to get paid for those higher raw materials."[108]  His statements indicate at the time that he understood customers would – in his words – "understand that these higher grain prices are going to require higher prices."[109]

(c)   The use of public statements by Producer Defendants and co-conspirators to signal their intentions to restrict the pork supply, as alleged above, was deceptive in and of itself.  These statements created the illusion that their actions were unilateral, when in fact they were secretly collusive.

195.   During the period more than four years before the filing of this Complaint, including the period before June 28, 2014, Defendants and co-conspirators conducted their conspiracy in secret, including communicating in secret in furtherance of the conspiracy at or incident to trade group meetings and events; and, upon information and belief, avoiding references to the conspiracy

---

[108]   Q4 2011 Tyson Earnings Conference Call (November 21, 2011).

[109]   Q4 2012 Tyson Earnings Conference Call (November 19, 2012).

in their documents, and communicating with each other by telephone to avoid written records.  In the context of *this* case, the Agri Stats' reports provided to the Producer Defendants and co-conspirators were the equivalent of competitors (here, the Producer Defendants and co-conspirators facilitated by Agri Stats) meeting in secret to exchange Competitively-Sensitive Information with each other in furtherance of their conspiracy.  Instead of meeting in secret in a hotel room and using a white board to conspire, the Producer Defendants and co-conspirators, facilitated by Agri Stats, used the non-public Agri Stats' reports that they received to exchange, *i.e.*, communicate, with each other in secret their Competitively-Sensitive Information to implement, monitor and enforce their conspiracy.[110]

196.   Defendants and co-conspirators intended for their affirmative acts of concealment to conceal the existence of their unlawful conspiracy from Plaintiffs, and Plaintiffs were unaware, and had no reasonable basis to be aware, of Defendants and their co-conspirators' acts of concealment during the conspiracy or, at a minimum, either before June 28, 2014 or four years before filing this Complaint.  As a direct result of Defendants and their co-conspirators' affirmative acts of concealment, each Plaintiff did not have actual or constructive knowledge of its claims alleged in this Complaint, or the facts that might reasonably have led any Plaintiff to discover or suspect that it had the claims against Defendants and co-conspirators – in the case of Plaintiffs' Sherman Act claims, prior to June 24, 2014 – and in the case of Plaintiffs' PSA claims, more than four years before filing this Complaint.  Before then, no Plaintiff was aware of facts that would

---

[110]   For example, in 2009, the President of Agri Stats, Brian Snyder, reportedly commented about the secretive nature of Agri Stats: "Agri Stats has always been kind of a quiet company.  There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect.  We don't advertise.  We don't talk about what we do.  It's always kind of just in the background, and really our specialty is working directly with companies about their opportunities and so forth."  Sanderson Farms Investor Day – Final (Oct. 2009).  At the same 2009 presentation, when discussing "bottom line numbers" (*i.e.*, a company's net earnings), Mr. Snyder declined to display those numbers publicly, stating "I'm not going to display the actual bottom line to the group here just because of the confidentiality nature of the information."  *Id.*  Yet, despite refusing to reveal this information publicly, Agri Stats provided producers with the "bottom line numbers" of their competitors on a regular basis via the reports discussed above.  These statements acted to conceal the true detail and nature of the Agri Stats reports from Plaintiffs and the public in general.  In other words, Agri Stats was stating publicly that it could not share information publicly and it did not provide an Producer's information to another because it was "confidential," but in private Agri Stats knowingly and intentionally shared each Producer Defendant and co-conspirator's Competitively-Sensitive Information with the others.

have alerted it (or a reasonably diligent person in Plaintiff's position) of the need to investigate whether it had the claims alleged in this Complaint.

197.   Plaintiffs did not have a reasonable basis to suspect that they had claims in this case until no earlier than 2018 in connection their Court filings in the *Broiler Chicken Antitrust Litigation* in the Northern District of Illinois.  Until at least then, the conspiracy among Defendants and co-conspirators was fraudulently concealed from Plaintiffs.

198.   Further, throughout the conspiracy, each Plaintiff engaged in due diligence in seeking to ensure that it was receiving competitive pricing for pork.  For example and without limitation, each Plaintiff used a method of purchasing pork – including, for example and without limitation, seeking price quotes and bids from their suppliers and/or investigating reasonably available public information – that caused it to believe in good faith at the time that it was receiving competitive prices for pork that it purchased from the Producer Defendants and co-conspirators.

## COUNT I

## ANTITRUST VIOLATION

199.   Plaintiffs incorporate by reference the allegations in paragraphs 1 through 198 above.

200.   Beginning at a time yet to be determined, but no later than 2009, and continuing in force and effect, or both, until 2018 (with an effect that continued thereafter), Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy to fix, increase, stabilize and/or maintain the price of pork sold to Plaintiffs and others in the U.S. at artificially elevated levels in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

201.   The contract, combination and conspiracy among Defendants and co-conspirators described in the immediately preceding paragraph consisted of a continuing course, pattern and practice of conduct regarding the production and pricing of pork in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

202.   The course, pattern and practice of conduct described above included, among other things, and without limitation, a continuing agreement, understanding and concert of action among

Defendants and co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)     To control and restrict the production and/or sale of pork to Plaintiffs and others in the United States;

(b)     To fix, stabilize, maintain and/or raise prices of pork sold to Plaintiffs and others in the United States;

(c)     To earn supra-competitive profits on the price of pork sold to Plaintiffs and others in the United States that resulted from Defendants and co-conspirators' collusion; and/or

(d)     They agreed to restrict, and did restrict, the supply of pork in the United States.

203.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged in this Complaint):

(a)     The agreed to exchange, and did exchange, current and future Competitively-Sensitive Information about pork sold in the United States;

(b)     They agreed to coordinate, and did coordinate, production levels for the production of pork in the United States; and/or

(c)     They agreed on production, or production levels of pork produced in the United States.

204.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in communications to discuss the restriction of pork production in the United States; participating in communications concerning the implementation of and adherence to their conspiracy; issuing statements about their restriction of pork production in accordance with the conspiracy; and/or exchanging Competitively-Sensitive Information on the production, pricing and/or sale of pork in the United States.

205.   As a result of Defendants and co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)      Price competition in the sale of pork among Producer Defendants and co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed, and eliminated;

(b)      Prices for pork sold by Producer Defendants and co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supra-competitive levels throughout the United States; and

(c)      Plaintiffs and other direct purchasers of pork produced and sold by Producer Defendants and co-conspirators have been deprived of the benefit of free and open competition.

206.   Each Plaintiff has been injured in its business or property by reason of Defendants and co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of pork is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

A.      A jury verdict in the amount of the compensatory damages sustained by each Plaintiff.

B.      A judgment against Defendants, jointly and severally, by the Court in treble the amount of the jury verdict, in accordance with Section 4of the Clayton Act, 15 U.S.C. § 15, and for attorneys' fees, costs and interest as allowable by law.

C.      A Permanent Injunction enjoining Defendants from communicating or exchanging Competitively-Sensitive Information through Agri Stats in a manner that enables each of them to know the other's Competitively-Sensitive Information, and, in the interest of protecting competition, requiring Agri Stats to take those reasonable steps necessary to make sure that a given pork producer's Competitively-Sensitive Information is not known or knowable by its competitors.

D.      Such other and further relief as the Court may deem just and proper.

## COUNT II

### VIOLATION OF THE PACKERS AND STOCKYARD ACT
**(Against All Defendants Except Agri Stats)**

207.  Plaintiffs incorporate by reference the allegations in paragraphs 1 through 198 above.

208.  The purpose of the PSA is, among other things, to provide for fair trade practices in the sale and marketing of livestock and meat products.  The PSA is remedial legislation and should be construed liberally to give effect its purposes.  *E.g.*, *Armour and Co. v. United States*, 402 F.2d 712, 717, 722 (7th Cir. 1968); *Swift & Co. v. United States*, 393 F.2d 247, 253 (7th Cir. 1968).  The PSA provides for a private right of action for persons injured by a violation of its provisions.  7 U.S.C. § 209.

209.  Each of the Producer Defendants and co-conspirators is a "packer" as that term is defined in Section 201 of the PSA, 7 U.S.C. § 191, in that each of them are persons engaged in the business of: (a) buying livestock in commerce for purposes of slaughter; (b) manufacturing or preparing meats or meat food products for sale or shipment in commerce; and/or (c) marketing meats, meat food products, or livestock products in an unmanufactured form acting as a wholesale broker, dealer, or distributor in commerce.

210.  Under Section 202 of the PSA, 7 U.S.C. § 192, it is unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form to:

(a)  Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device;

(b)  Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever;

(c)  Sell or otherwise transfer to or for any other packer, swine contractor, or any live poultry dealer, or buy or otherwise receive from or for any other packer, swine contractor, or any live poultry dealer, any article for the purpose or with the effect of apportioning the supply between any such persons, if such apportionment has the tendency or effect of restraining commerce or of creating a monopoly;

(d)   Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce;

(e)   Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce;

(f)   Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, (2) to apportion purchases or sales of any article, or (3) to manipulate or control prices; and/or

(g)   Conspire, combine, agree, or arrange with any other person to do, or aid and abet the doing of, any act made unlawful by subdivision (a), (b), (c), (d), or (e).

211.   The PSA's enacting regulations contain further restrictions.   For example, the regulations limit packers' rights to share pricing information with competitors.

> No packer, dealer, or market agency, in connection with transactions subject to the provisions of the act, shall, in person, or through employed buyers, for the purpose of restricting or limiting competition, manipulating livestock prices, or controlling the movement of livestock, prior to, or during the conduct of, his buying operations: (a) Furnish competitor packers, dealers, market agencies, or their buyers or representatives, similarly engaged in buying livestock, with information concerning his proposed buying operations, such as the species, classes, volume of livestock to be purchased, or prices to be paid; or (b) furnish any other buying information to competitor buyers.

9 C.F.R. § 201.69.

212.   The regulations also require that "each packer and dealer engaged in purchasing livestock, in person or through employed buyers, shall conduct his buying operations in competition with, and independently of, other packers and dealers similarly engaged."  9 C.F.R. § 201.70.

213.   The Competitively-Sensitive Information that the Producer Defendants and co-conspirators privately sent to or received from one another through the Agri Stats reports is/are an "article" under the PSA.  Additionally, inasmuch as Producer Defendants and co-conspirators buy livestock, including sows, information about their respective purchase volume of sows, and any of

the other Competitively-Sensitive Information that they sent, received, communicated or exchanged with each other through the Agri Stats reports is an "article" under the PSA.

214.   As alleged above, the Producer Defendants and co-conspirators sent or received the Competitively-Sensitive Information for the purpose and with the effect of manipulating the price of pork sold to Plaintiffs and others in the United States.

215.   As alleged above, the Producer Defendants and co-conspirators engaged in other conduct, including without limitation, communicating, arranging, or signaling or otherwise coordinating with each other to restrict pork production in the United States in order to increase, fix, stabilize, and/or maintain the price of pork sold to Plaintiffs and others in the United States.

216.   Even if the actions of each Producer Defendant or co-conspirator to signal or communicate its intentions to restrict pork production were arguably lawful – and based on the allegations in this Complaint they were and are not – this conduct by each of them, in concert, made their restriction of the domestic pork supply unlawful as alleged in this Complaint.

217.   The actions of each Producer Defendant and co-conspirator, as set forth above, constitute one or more violations of 7 U.S.C. § 192 and the enacting regulations of the PSA.

218.   Section 308 of the PSA, 7 U.S.C. § 209, provides that if any person subject to the PSA violates any of the provisions of the PSA, then that person shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation. Further, this section provides that such liability may be enforced by suit in any District Court of the United States of competent jurisdiction.

219.   The violations of 7 U.S.C. § 192 committed by the Producer Defendants and co-conspirators have illegally limited the supply of pork, manipulated its price, injured the Plaintiffs, and caused them damages by forcing them to pay inflated, supra-competitive prices for pork.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against each Producer Defendant as follows:

A.     Damages to the maximum extent allowed under law in consequence of the violations of the PSA, and a joint and several judgment in favor of Plaintiffs and against all Producer Defendants.

1     B.     Attorneys' fees, costs of suit, and interest as allowable by law.

2     C.     Such other and further relief as the Court may deem just and proper.

3                              **JURY DEMAND**

4     Plaintiffs demand a trial by jury of all issues so triable.

5
      Dated: December 28, 2021                    Respectfully submitted,
6

7                                                 */s/ Christina R.B. López*
                                                  Christina R.B. López
8                                                 SHERRARD ROE VOIGT & HARBISON, PLC
                                                  150 3rd Avenue South, Suite 1100
9                                                 Nashville, Tennessee 37201
                                                  Phone: (615) 742-4200
10                                                clopez@srvhlaw.com

11                                                ***Counsel for Plaintiffs***

12

13    Of counsel:

14    Phillip F. Cramer
      SHERRARD ROE VOIGT & HARBISON, PLC
15    150 3rd Avenue South, Suite 1100
      Nashville, Tennessee 37201
16    Phone: (615) 742-4200
      pcramer@srvhlaw.com
17
      Paul E. Slater
18    Joseph M. Vanek
      David P. Germaine
19    Alberto Rodriguez
      Jeffrey H. Bergman
20    SPERLING & SLATER, P.C.
      55 West Monroe Street, Suite 3200
21    Chicago, Illinois 60603
      Tel: (312) 641-3200
22    Fax: (312) 641-6492
      PES@Sperling-law.com
23    JVanek@Sperling-law.com
      DGermaine@Sperling-law.com
24    ARodriguez@Sperling-law.com
      JBergman@Sperling-law.com
25

26

27

28

---

COMPLAINT AND DEMAND FOR JURY TRIAL                                    64